[Filed July 2, 1888.]

S. C. FLINT, ADMINISTRATOR OF THE PARTNERSHIP OF HUMPHREY AND FLINT, APPELLANT, *v.* R. PHIPPS ET AL., RESPONDENTS.

DEED—DELIVERY.—A deed may be delivered by doing something and saying nothing, or by saying something and doing nothing, or it may be by both.

DEED—POSSESSION OF GRANTEE—PRESUMPTION—BURDEN OF PROOF.—A deed properly executed in the possession of the grantee is presumed to have been delivered to him. He who disputes this presumption has the burden of proof, and must show that such deed was never delivered.

PROMISSORY NOTE—CONSIDERATION—BURDEN OF PROOF.—A promissory note imports a consideration. Whoever alleges that a promissory note is without consideration has the burden of proof.

APPEAL from Douglas County.

*James F. Watson,* and *J. C. Fullerton,* for Appellant.

*W. R. Willis,* and *J. W. Hamilton,* for Respondents.

STRAHAN, J.— This is a suit to foreclose a mortgage executed by the defendant R. Phipps, to secure the payment of a promissory note payable to Humphrey and Flint for $13,045, dated September 23, 1886, and signed by W. F. Owens and R. Phipps, due thirty days after date.

The defendant's answer admits that Owens and Phipps signed the note, but deny that it was delivered, or that it was executed for value, or any consideration. The answer then alleges that the consideration for signing said note was the taking up and delivery to Owens and Phipps of a certain note given by Owens and Phipps, N. Cornutt, and H. Weaver to S. Hamilton, for twelve thousand dollars, dated January 29, 1884, upon which there was then due and payable the sum of eight thousand dollars, and also to loan said Owens and Phipps five thousand dollars in money; that they did not take up said note, nor did they loan Owens and Phipps five thousand dollars, or any sum; that there was no other consideration for said note. The answer admits that Phipps signed and acknowledged the mortgage, but denies that either it or the note described therein was delivered; that as soon as the defendant Phipps discovered that the plaintiffs had not taken up the Hamilton note, and did not have the same to deliver to him, he refused to deliver said note and mortgage to the plaintiffs; that W. S. Humphrey, one of the plaintiffs, unlawfully, wrongfully, and without the consent of the defendant Phipps, took and carried away said note and mortgage from the table on which they were then lying, and delivered said mortgage to the county clerk, and procured the same to be recorded on pages 596, 597, and 598, volume 7, record of mortgages of Douglas County, Oregon. Deny that said mortgage was duly delivered on the twenty-third day of September, 1886, or at any other time, or that the sum of money therein specified, or any part thereof, is now due or owing to the plaintiffs. Deny that thirteen hundred dollars, or any part thereof, more than two hundred and fifty dollars, is a reasonable attorney's fee for foreclosing said mortgage. The reply denies the new matter in the answer. The cause was referred and the testimony taken in writing, after which the Circuit Court took the case under advisement.

On the 9th of November, 1887, the learned circuit judge filed
an able opinion, holding in effect that there was no consider-
ation for the note and mortgage, and that they were never
delivered. This opinion was accompanied by findings of fact
and conclusions of law in harmony therewith, and was followed
by a decree dismissing the suit, from which this appeal is taken.
Upon the argument here, two questions have been presented.
(1) Were the note and mortgage sued on delivered? (2) Were
they executed upon a sufficient consideration? These questions
I will now proceed to examine in their order.

1. The question of delivery is purely a question of fact. It
is conceded that no particular form of words are necessary to
constitute a delivery. "It is not necessary," said Lord, C. J.,
in *Fain* v. *Smith,* 14 Or. 82; 58 Am. Rep. 281, "there should
be an actual handing over the instrument to constitute a delivery.
A deed may be delivered by doing something and saying noth-
ing, or by saying something and doing nothing, or it may be by
both. (Shep. Touchstone, 57.) 'But by one or both of these,'
Spencer, J. said 'it must be made.'" (*Jackson* v. *Phipps,* 12
Johns. 421; *Byers* v. *McClanahan,* 6 Gill & J. 256; *Stewart* v.
*Redditt,* 33 Md. 67.)

W. S. Humphrey, since deceased, was one of the plaintiffs,
and was called as a witness and testified in substance: "That
at the time the note and mortgage sued on were given, W.
F. Owens, Robert Phipps, Hans Weaver, and others, were
indebted to the plaintiffs in the sum of $19,045, for money
advanced on certain bonds given by them; that he and Phipps
talked the matter over while the mortgage was being drawn up,
and Phipps said he would give witness a mortgage on his land.
He said he knew we boys were entitled to our money and he
would give us a mortgage, but he did not know whether his wife
would sign it or not. He said his wife had said she would not
sign any mortgage, but that we could go out and see her about
it; but before the note and mortgage were concluded said that
he did not think it was worth while for us to go out to see her
about it, but that he would go ahead and give us the mortgage.
He said he knew we were entitled to our money and he would

give us a mortgage to secure us. He further said, 'you boys are entitled to your money and you shall not lose a cent, and I will give you a mortgage on my land to secure you.' He said he had no idea Owens had drawn so much on the bond given by him, Owens, and others, but they would have to pay it. Mr. Phipps signed the mortgage and delivered it to us to secure the above amount mentioned, on the twenty-third day of September, 1886. The note secured by the mortgage was delivered at that time. Mr. Phipps sat at the further end of the table and signed and acknowledged the execution, and it was passed up the table, and I don't think he said a word about it or objected to the delivery. He himself could not have handed it to me on account of his sitting at the further end of the table from me. I heard no objection from any one. I don't think I heard any words spoken consenting to the delivery of the note and mortgage. I did not hear Mr. Phipps ask Mr. Fullerton whether or not the Hamilton note was included in the mortgage. Did not hear Phipps ask Fullerton anything about it. Mr. Fullerton read the mortgage after it was prepared, to all present; nor did I hear any one ask Mr. Fullerton that question, or any one else. I did not hear Mr. Phipps ask Mr. Fullerton or any one else that question. Mr. Phipps did agree to give the mortgage without the Hamilton note in it. He agreed as we walked up the street together to give us a mortgage, but he said he did not know whether his wife would sign the mortgage or not, as she said she would not sign a mortgage for any one. But he would go to see her about it if we desired, but said he would sign it himself."

Mr. J. C. Fullerton gives the following account of the execution and delivery of the note and mortgage in controversy: "In the evening of September 23, 1886, I was sent for to come over to town and prepare, or assist in preparing, a mortgage which Mr. Phipps was to give to secure a debt he, Owens, and others, owed the bank. I came over, and Mr. Phipps came into town shortly afterwards. I went down to Lane's office, and at the request of some of the parties I went to the clerk's office to secure the description of Mr. Phipps' land, Mr. Flint accompanying me. We procured the description from the record the

best we could, and returned to Mr. Lane's office, where at my request Mr. Lane wrote the mortgage. Mr. Flint read the description of the land from the notes he had taken. After the mortgage was prepared the whole party went into the back room. I read the mortgage to the parties, or to all present, except a part of the description. The note was signed by Owens and Phipps, and passed up to me, and by me handed to Mr. Humphrey. Mr. Phipps then signed the mortgage. I signed it as a witness. Colonel Lane took the acknowledgment; I also signed it as a witness. It was then slid up the table, passing through Mr. L. F. Lane's hands to where I was sitting, and by me taken and laid on the corner of the table for Mr. Humphrey, who was standing at my shoulder. After the mortgage had been passed to me, and while we were all in the room, Mr. L. F. Lane expressed a doubt as to whether Mr. Phipps could claim contribution from his co-obligors on the bond to Humphrey and Flint, if he paid this mortgage. This matter was discussed for a minute or two, and we all, at least I went out into the front room, and the others came out and we started home, Mr. Humphrey and I in company. We stopped a moment by Ball's office. Mr. Phipps and Mr. Flint joined us, and I don't remember whether any one else or not. My impression is that they all left the office as we did. While standing there Mr. Phipps said, addressing Humphrey and Flint who were both there: 'Boys, if you won't put that mortgage on record I will raise the money to-morrow, or in a few days,' or words to that effect. Mr. Phipps did not in my hearing express any dissatisfaction with the mortgage, nor did he make any objection to its delivery as far as I know. The only thing that Mr. Phipps said about it that I remember of is what he said on the corner after we came out of the office, when he told Humphrey and Flint not to put it on record, as he would pay it in a day or two."

On his cross-examination this witness, referring to the execution and delivery of the mortgage, said in substance: "The mortgage after it was signed and acknowledged was slid along the table from where Colonel Lane, who took the acknowledgment,

was standing, to Mr. L. F. Lane, who was sitting at the middle
of the table; he held it a moment, I think, folded it or partly
folded it; he then passed it along up to me.  I was sitting at
the other corner of the table.  I took it and folded it, and laid
it on the corner of the table.  I think Mr. Humphrey picked it
up as soon as I laid it down.  The table was a small one.
Colonel Lane slid it, or handed it to L. F. Lane; he held it a
moment and laid it on the table, or pushed it along toward me.
I picked it up.  I would not be certain whether L. F. Lane
indorsed this mortgage or not.  I think he did.  I know it was
either not folded, or folded so loosely that I took it in my hand
and folded it, or pressed down the folds.  I am not positive
whether Mr. Lane indorsed the mortgage or not; I believe that
he did.  Mr. Phipps did not tell Mr. Humphrey or me in so
many words to take the mortgage, but acknowledged the execu-
tion of it freely and voluntarily but a moment before it was
taken up by me."

Mr. W. S. Humphrey was recalled, and testified further as to
the delivery of the note and mortgage in substance: "When Mr.
Fullerton and Mr. Lane had prepared the mortgage, Mr. Fuller-
ton read the mortgage to Mr. Phipps and all present, with the
exception of the description, which was a long one, and the note
mentioned was signed by Mr. Owens and Mr. Phipps previously
to this time.  It was then inserted or copied in the mortgage,
and passed to Mr. Phipps to be signed by him.  After he had
signed it, Mr. Fullerton and Colonel Lane witnessed it, and it
was then passed or taken by Colonel Lane, and the acknowledg-
ment was taken by him.  He passed it La Fayette Lane, who
indorsed it and passed it upon the table to our attorney, Mr.
Fullerton.  Mr. Fullerton examined it and passed it to me.  I
looked over it to see that it was filled out in all its parts, and
put it in my pocket, where I already had the note.  We stopped
there a few minutes, and La Fayette Lane, I think, spoke up, not
to any one in particular, but in a general way, and said that he
was not altogether satisfied as to whether Mr. Phipps could get
contribution from the rest of the bondsmen.  In my opinion
Mr. Fullerton remarked, he will have no trouble about that.  I

think he added that it is a general established rule of law that
when one pays the debt or obligation of a joint obligor he is
entitled to contribution. I think in substance that is about the
language used. Mr. Phipps in my presence or hearing did not
object to the delivery of the note and mortgage to me. Had he
objected I should have returned them to him, and went on and
issued an attachment to secure our claim. Mr. Phipps made no
objection to this mortgage after it was signed and executed on
account of Hamilton's claim not being in. Neither Mr. Phipps
nor any one else forbade our taking the mortgage and putting it
on record."

S. C. Flint gives substantially this account of the transaction :
"The mortgage was drawn up by Lane, and while he was draw-
ing it up Fullerton and I got the description of the land at the
clerk's office, and I read the description to Lane, and he copied
it in the mortgage. Fullerton then read the mortgage over,
Phipps signed it, and Colonel Lane took the acknowledgment,
and then handed the mortgage, I think, to Fullerton, who folded
it once and either laid it on the table or passed it over towards
Humphrey, I would not be certain which; that is as near as I
can remember now. Mr. Phipps made no objection to Humph-
rey taking the mortgage, and said nothing that I heard. He
was standing right near the table in the back room of Lane's
office at the time. I heard Phipps say when he was out of
doors near the corner, not to put the mortgage on record, and he
would raise the money in a few days and pay it off. He also
told me the same thing later in the evening just before I went
home. He said don't put the mortgage on record, and he
would raise the money in a few days; those are the words he
used, as near as I can remember."

R. Phipps, the mortgagor, in substance gives this account of
the execution of the note and mortgage: "Mr. Owens sent out
to my house the twenty-third, I believe, evening of September last
for me to come to town. I came to town. I found out when
I came to town a United States deputy marshal was here to
attach property for amount of five thousand dollars that Owens
should have *owed* a company of the name of Hall, I think,

claiming they had me and others as security. I says to Owens:
' What in the devil, or what in hell, does this mean?' Says he:
'It is an unjust debt against you, and you will never have to
pay it.' He tried to raise the five thousand dollars and couldn't.
I told him I would mortgage my land to help him out if any one
would let me have the money. I wouldn't give a mortgage
over the Hamilton debt. I and others had went his security for
twelve thousand dollars. If any person would let him have the
money and take the Hamilton note that would make about thir-
teen thousand dollars. He had paid about five thousand dollars,
which had left a balance of eight thousand dollars, and the five
thousand dollars would make thirteen thousand dollars. They
went up to Hamilton's, I think Humphrey and Flem Owens.
I don't known positive if Carey Fullerton went or not. They
went up the second time I think; came back. Owens says to
me that Humphrey and Flint would consume (assume?) the
Hamilton debt and let him have the five thousand dollars.
They went in the back room in La Fayette and John Lane's
office, I suppose to draw up this mortgage. I sat down by the
stove in the front room. Humphrey came out and asked me to
take a walk. I objected, and he asked me the second time. I
formed an idea that he was going around to the saloon to get a
drink; but he didn't. We went out and walked down to the cor-
ner and turned to the left, and came up past Joe Sheridan's
store, and around the block to the office and went in. Going
up the street talking about Owens being behind with foreign
companies I spoke, and says I: 'I don't see how in the devil
that can be.' When I came into the office I sat down by the stove;
other parties were in the back room; sometime they called me
in and said that is ready, or the mortgage is ready. Carey Ful-
lerton was sitting down in a chair at the table. He reads the
mortgage, and stops and says, it's not necessary to read all of it.
I signed the mortgage, got up and stood on the floor studying a
little while, the way he read it Hamilton's name hain't been
used in that mortgage; wheels around partly in his chair; 'is
Hamilton's name to be in this mortgage?' I said, 'yes.' Says he,
'it will have to be another mortgage.' La Fayette spoke; said

something about releasing our co-obligators. The mortgage was lying on the table. Says I, 'that ain't what I intended; I won't give that kind'; I think it was that kind of a mortgage. Humphrey picked up the mortgage and started out on the street; a few minutes Carey Fullerton followed him. Flint, I couldn't be positive whether he went out with Carey or not. In a few moments I started out to look for them. As I came out of the light into the dark, it made the dark appear darker than it would be. I stepped down to the corner; I heard two persons step off; I took it, in fact I am satisfied it was Carey Fullerton. I says, 'don't put that on record.' There was no reply. I walked up to the office; set down. Sometime afterwards Flint came in. Mr. Flint said he would not put that on record until there was more satisfaction."

L. F. Lane, who drew the mortgage, and one of the defendants' witnesses, said in answer to question ten: "As I stated before, he (Phipps) said nothing specifically for what he gave the mortgage. From what Mr. Humphrey said in his presence I inferred it was to secure the bank. He several times stated he (Phipps) would raise that five thousand dollars and pay off that claim next morning. Mr. Phipps did most of his talking after I called his attention to the effect of the mortgage."

1. This is the material evidence on each side in relation to the execution and delivery of the note and mortgage. There are other facts referred to by the witnesses which affect the question more remotely, but the evidence above collated presents the account given on each side as to what occurred at the time, and from this evidence mainly we must determine whether or not said note and mortgage were in fact executed and delivered. On the question of the delivery, the note seems to have been lost sight of by the defense entirely. Their evidence relates altogether to the delivery of the mortgage; but I suppose they both rest upon the same facts, and that they ought to be so regarded by the court. Before proceeding to a further consideration of the facts, I think the circumstances under which it is alleged these papers were executed ought to be adverted to. On the evening of the day of their alleged execution, a deputy United States

marshal appeared in the city of Roseburg with an attachment issued out of the United States Circuit Court for the district of Oregon in favor of *Hall & Co.* v. *W. F. Owens, R. Phipps et al.* for five thousand dollars. In some way, how does not appear, nor is it material, Owens learned the facts and so did Humphrey and Flint. Owens sent into the country for Phipps to come to town, and he arrived there late in the evening, and the note and mortgage were signed between eleven and twelve o'clock that night. Under these circumstances it was natural for Humphrey and Flint to desire security for their debt, and all of their movements were directed to that end. Phipps now claims he was not liable to them for anything; but that will be considered further on. The defendant Phipps' liability to Dr. Hamilton is beyond question, and he was anxious to secure him. His liability to Hamilton was as security for Owens, and not otherwise, and if he was liable to Humphrey and Flint for any sum, it was as security for Owens and not on his own account. If Phipps was liable to Humphrey and Flint at all, no reason is perceived why he should not have had the same interest in securing them that he did Dr. Hamilton. He probably would have been governed by the same motive in the one case as in the other; at least, so far as we can discover from this evidence there was no difference.

The motive assigned by one of the plaintiffs is a desire or willingness on the part of Phipps in the presence of impending financial disaster to secure those whom they call "home creditors." On the other hand, the motive assigned on the part of the defendant Phipps was to secure Dr. Hamilton, make him a preferred creditor, and to obtain from Humphrey and Flint a further loan of five thousand dollars to pay off Hall & Co. Between these conflicting motives and purposes, we are compelled to decide from the evidence in this record. Whatever may have been the motive of Phipps, it seems to us highly improbable that Humphrey and Flint would, in the face of threatened bankruptcy of Owens and Phipps, without any benefit to themselves whatever, make a further loan of five thousand dollars to Owens and Phipps, and assume Hamilton's debt of eight thou-

sand dollars, and stay up till the hour of midnight hunting for such an investment. Such a suggestion, to say the least of it, seems highly improbable. Before proceeding further with an examination of the evidence on the question of delivery, it may be proper to advert to the legal presumption which arises in all cases where a deed properly executed and acknowledged is found in the possession of the grantee. In such case it will be presumed that such deed was delivered by the grantor and accepted by the grantee, in the absence of proof to the contrary. ( *Wolverton* v. *Collins*, 34 Iowa, 238; *Adams* v. *Frye*, 3 Met. 103; *Chandler* v. *Temple*, 4 Cush. 285; *Scrugham* v. *Wood*, 15 Wend. 545; 30 Am. Dec. 75; *Games* v. *Stiles*, 14 Peters, 322; *Jaques* v. *Trustees of the M. E. Church*, 17 Johns. 548; *Souverbye* v. *Arden*, 1 Johns. Ch. 240; 3 Washburn on Real Property [5th ed.], p. 312, § 31.)

The learned author of Devlin on Deeds, volume 1, section 294, states the rule thus: "The possession of a deed duly executed in the hands of the grantee is *prima facie,* but not conclusive evidence of its delivery. It therefore follows that he who disputes this presumption has the burden of proof, and must show that there has been no delivery."

It being undisputed that the mortgage was executed with all the formalities required by law, and that the same is in the possession of the mortgagees named therein, makes a *prima facie* case for them. They need no other proof in the first instance. It devolves on the defendants to rebut this presumption, and to accomplish that, they must have a preponderance of evidence in their favor on that issue. Laying this presumption entirely out of the case, it seems to me that the evidence preponderates in favor of the delivery of the mortgage. There are a greater number of witnesses in favor of the plaintiffs. They had the same opportunity of knowing the facts; to say the least, they are of equal intelligence. There is nothing in the character of their evidence to cast doubt or suspicion upon it, and the delivery of the deed follows as the usual consequence of its signing and acknowledgment; in other words, it is the legal completion of the acts in which the parties were then engaged.

The evidence offered by the defendants must meet and over-come these facts and circumstances which weigh in favor of the plaintiffs, and they must be of such a nature and character as to enable the court to declare that the weight or preponderance of the evidence is with the defendants on the question of delivery. The defendants' evidence fails to do this; but when the presumption which the law declares from the undisputed facts is allowed to have any force or effect, it must be apparent that the court could not do otherwise than find that the note and mortgage sued on were delivered.

2. Equally untenable is the defendants' claim that the note declared upon it is without consideration. A promissory note imports a consideration. Whoever alleges the contrary has the burden of proof. (2 Greenleaf on Evidence, § 172; Story on Promissory Notes, § 7; *Lines* v. *Smith*, 4 Fla. 47; *Burnham* v. *Allen*, 1 Gray, 496; *Decon* v. *Carruth*, 108 Mass. 242; 1 Parsons on Bills and Notes, p. 193; 1 Daniel on Negotiable Instruments, § 163.) But it is useless to multiply authorities on this question; they are all to the same effect. A very careful review of the evidence satisfies us that there was a sufficient and adequate consideration for the note, and that consideration was Owens' indebtedness to the plaintiffs. It is true the plaintiffs are not required to prove in the first instance there was any consideration for the note. They may content themselves with meeting such affirmative evidence as the defendants may offer tending to impeach the consideration.

The allegation of the answer is that the note was signed in consideration of said plaintiffs taking up and delivering to Phipps and Owens the Hamilton note, upon which eight thousand dollars was due, and the loaning to Phipps and Owens of five thousand dollars, and that plaintiffs did neither. But the learned circuit judge seems to have tried the case on the theory that the plaintiffs were bound to prove the consideration for the note, and inasmuch as their testimony tended to prove that Phipps was liable to plaintiffs on a bond given by Owens, with Phipps and others as sureties, if he reached the conclusion which he did, that the plaintiffs had failed to prove that Phipps signed

such bond, that then in such case there was no consideration for the note. If it were necessary to a proper determination of this case, we would feel constrained to reach a different conclusion on that question. In many parts of this testimony, Phipps impliedly admits his liability on that bond, and he scarcely seems willing to deny it in any form only when driven to it by the direct question of his counsel. And when Lane spoke of the right of contribution amongst the parties to that bond at the time and after the note and mortgage were signed, Phipps did not pretend that he had not signed the bond. On the contrary, it was Lane's suggestion if he paid this note he might not be able to enforce contribution from the other parties to it that made him hesitate. But it is not necessary to examine this evidence in detail. Its whole tenor satisfies us that Phipps did sign that bond. But if it were otherwise, Owens' liability to the plaintiffs is beyond question. His debt would be a sufficient consideration to sustain the note, so that if Phipps either executed the note to secure the debt of Owens, or the liability of himself and Owens on the bond, the note would have a sufficient consideration to support it. But in any event the plaintiffs are entitled to recover on the note, unless the defendants have proven by a preponderance of the evidence that the only consideration therefor was that set up in their answer. No other inquiry as to the consideration of the note is presented by the pleadings.

The decree of the court below must therefore be reversed, and a decree entered here foreclosing said mortgage.