Argued 4 April, decided 12 June, 1906.
### PIERSON *v.* FISHER.
85 Pac. 621.

APPEAL—PRESUMPTION THAT EVIDENCE WAS PROPERLY ADMITTED.

1. Where testimony that is inadmissible under the pleadings has been received without objection, it will be presumed on appeal that the cause was tried as though there had been an issue on the subject to which the evidence related.

CANCELLATION OF INSTRUMENT—RETURN OF CONSIDERATION—FRAUD.

2. It is always necessary, as a condition precedent to the cancellation of an instrument or the rescission of a contract, to return or offer to return the consideration received, so that the parties may be placed in their original positions; unless the contract was accomplished by force or fraud, in which cases no return or offer of the consideration is necessary.

DEEDS—PRESUMPTION OF DELIVERY—BURDEN OF PROOF.

3. The possession of an executed deed by the grantee named therein creates a presumption of its regular delivery, and one asserting the contrary has the burden of proving such claim.

DEEDS—ACTS AMOUNTING TO DELIVERY.

4. Delivery of a deed is accomplished when the grantor voluntarily passes it to the grantee, or some one for him, or when the grantor does or says something that discloses unmistakably an intent to finally part with all control over the instrument.

From Yamhill: WILLIAM GALLOWAY, Judge.

Statement by MR. JUSTICE MOORE.

This suit was instituted January 12, 1905, by Mary E. Burbank against Charles F. Fisher, to remove a cloud from the title to real property. The complaint alleges in effect that plaintiff's mental faculties, by reason of advanced age, were impaired: that the defendant having knowledge thereof and with intent to defraud her, falsely represented that the stock of the American Alarm Co., a corporation, was of the par value of $50 a share; that he had found a person who would pur-

chase her farm in Yamhill County and pay therefor the sum of $8,850, if she would accept $4,000 in cash and stock of that corporation of the face value of $4,850; that such representations were false, and so known to be by the defendant and such stock was worthless; that plaintiff having no knowledge of the value thereof, or of the falsity of such statements but firmly believing them, verbally agreed that in consideration of the payment of that sum and of the delivery of such stock she would convey her farm to such person as the defendant might designate; that pursuant to the terms of such agreement, she signed, sealed, caused to be witnessed and acknowledged a deed, purporting to convey to the defendant the legal title to the farm, but she did not deliver the instrument, leaving it on a table intending to retain possession of it until the consideration specified had been paid and delivered to her; that without her knowledge or consent, the defendant took such instrument and carried it away and unless restrained, will cause it to be recorded, thereby further clouding the title to the premises, to prevent which she has no plain, speedy or adequate remedy at law. The prayer for relief is for an injunction to prevent the deed from being recorded, for the removal of such cloud and to require the defendant to surrender the deed that it may be destroyed.

The answer denied the material allegations of the complaint and averred that January 2, 1905, the defendant entered into a contract with the plaintiff by the terms of which it was stipulated that in consideration of the delivery to her of the stock of such corporation, of the par value of $7,500, and $1,000 in cash, she would convey her farm to him or to such purchaser thereof as he might secure; that five days thereafter this contract was modified so that she accepted the defendant's promissory note for $1,000, payable in one year with 8 per cent interest, in lieu of that sum in cash, and executed and delivered to him her deed of the premises, receiving such stock and note, except that by agreement he retained the sum of $50 for procuring an abstract of the title to the land; that at the time the deed was executed the stock referred to was of the reasonable

value of $50 a share, which fact plaintiff then well knew; that at such time the defendant was and now is solvent and is ready, able and willing to pay the sum so expressed and interest, and tenders the amount thereof to her; that the note and stock were delivered to plaintiff January 7, 1905, the control of which she now has and defendant holds possession of the deed and is the owner of the land. The reply put in issue the allegations of new matters in the answer and the cause having been tried, it was decreed that the defendant had no interest in the land or any part thereof, and the temporary injunction which had been issued was made perpetual, whereby he was restrained from recording the deed and from incumbering or conveying any part of the premises, and he appeals. After the appeal was perfected the plaintiff died testate, whereupon Clark M. Pierson, the executor of her last will and testament, and her devisee, the State of Oregon as trustee, were substituted as respondents.                                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Thomas O'Day.*

For respondents there was a brief over the names of *McCain & Vinton, F. W. Fenton* and *G. G. Bingham,* with an oral argument by *Mr. James McCain.*

MR. JUSTICE MOORE delivered the opinion of the court.

The evidence shows that a patent was issued February 3, 1903, to Ira S. Bunkard for a fire and burglar alarm. This device, as appears from blue prints offered in evidence, consists of clock machinery which is set in motion by the severing of a cord by fire or by the raising of a window or the opening of a door, causing a bell to ring and disclosing on an indicator the location of the disturbance and the probable cause of the alarm. The American Alarm Co. was incorporated, under the laws of this state, with a capital stock of $50,000, divided into 1,000 shares of $50 each. Bunkard, in consideration of $600, assigned all his interest in this patent to the incorporators of that company who transferred such right to the corporation for its entire capital stock, on the assumption that it had been

(48th Or.—15)

fully paid up. The company delivered to the incorporators, who paid for an assignment of the patent, $30,000 of its stock, and the remainder of the issue, which is designated as "treasury stock," was held in trust for the corporation, to enable it by the sale thereof to secure money to be used in perfecting the invention and in manufacturing and selling the apparatus. About one-half of the treasury stock has been disposed of, a small part of which was given to persons whose influence was considered advantageous to the company, and the remainder sold at par. The corporation, January 7, 1905, possessed in cash about $325; manufactured alarms costing about $1,800; patterns of the value of $1,800; and office furniture worth about $75, making the value of its tangible property about $4,000. The company in a year and a half prior thereto, or during the period of its existence, had disposed of the right to manufacture and sell its alarms in one county only and had sold only six fire and burglar alarms to persons who were not the owners of its capital stock. These meager sales were accounted for by the delay necessitated in developing the machinery and in perfecting its operation, and also by difficulty experienced by the agents of the company in finding a factory where the alarms could be manufactured at reasonable prices, which obstacles, so it is claimed by defendant's witnesses, had been overcome only a few days prior to January 7, 1905. The company issued circulars which, for a prelude, contained the following couplet:

"Dollars and dimes, dollars and dimes,
An empty pocket is the worst of crimes."

The prospectus showed how much money had been made by investing a single dollar in various enterprises and what sales of alarms could be expected, asserting that from the purchase of one share of alarm stock at $50, the sum of $1,500 might be realized.

The plaintiff, Mrs. Burbank, became acquainted with the defendant soon after the corporation was organized, when he called upon her with a view of selling its capital stock and at that time she received one of these circulars. In May, 1904,

he visited her again and gave her one share of such stock, whereupon she purchased of him five more shares of the stock for which she paid $250. At that time Mrs. Burbank was 77 years old, and until the death of her husband, which occurred about four years prior thereto, she had never transacted any business of importance, though possessed of considerable property. The defendant, having only thrice met the plaintiff, wrote her as follows:

"AMERICAN ALARM COMPANY.
                                     Portland, Ore., Nov. 14th, 1904.
Mrs. Mary E. Burbank,
            Lafayette, Oregon.
Dear Mrs. Burbank.

I have recently bought a home here in Portland and am happily located, and Mrs. Fisher and myself wish to extend to you a special invitation to come and spend Thanksgiving week with us. We have both lost our parents, and we dearly love elderly people, and feel we would be glad to do all in our power to make you happy and enjoy your visit with us. You have not as yet met my wife, but I have so often spoken of you that she already feels she is acquainted with you.

Hoping that you are well and that you will be able to come,
                              I am, respectfully,
                                        C. E. Fisher,
                                        670 Tillamook St."

Mrs. Burbank, as a witness in her own behalf, testified that the defendant visited her in January, 1905, telling her he had found a purchaser from California who would take her land and make a nut farm of it; that she told him the premises contained 190 acres which she would sell for $45 an acre and take $4,000 in cash and a mortgage on the land to secure the remainder of the purchase price; that after discussing the proposed sale a short time, he suggested the acceptance of Alarm stock instead of cash, to which proposition she did not accede, telling him she wanted it distinctly understood that she must have cash when she sold her farm; that he thereafter returned with a deed which had been prepared and asked how much money was required to be paid down and she informed him that she must have $4,000; that after doing some writing, he said: "Here, Mrs. Burbank, is where you sign your name to

the deed," and she subscribed her name to the instrument, which was witnessed and acknowledged and left on a table; that going into another room and returning in a few minutes she was unable to find the deed; that she was then called to dinner, whereupon he left, saying there were the certificates of stock and a promissory note, but she did not take them. On cross-examination, she said that prior to signing the deed she never entered into any agreement with the defendant to sell her farm; that she never consented to take Alarm stock as a part of the consideration therefor, though she told him if a sale of the premises was effected she might buy some of the stock from him; that she did not see him take the deed, but immediately after he left the house she found it was gone; that she signed the deed thinking the defendant had issued a check to her for $4,000, and that the remainder of the consideration would be secured by a mortgage on the premises, though nothing was said about giving security; that she did not give him a lease from which to obtain a description of the farm and if he secured the evidence of a demise of the premises, it was when he was examining her papers; and that the deed which she signed was not read by or to her.

P. P. Olds, a notary public, testified that at defendant's request he went to the home of Mrs. Burbank, to take her acknowledgment to a deed; that the defendant having preceded him was at her house when he reached it; that about 10 or 15 minutes after his arrival the defendant took a deed from his pocket, to which she subscribed her name, and, it having been witnessed, he thereupon appended his certificate, after taking her acknowledgment, leaving the deed on a table; that Mrs. Burbank, having signed the instrument, took a seat at the right of and about 10 feet from the witness, who occupied a chair between her and the defendant; that after the deed had remained on the table about five minutes, the defendant took it, and put it in his pocket without paying her any money as a consideration for the conveyance; that when the deed was so taken he did not observe Mrs. Burbank and could not say whether or not she saw the defendant get the instrument; that

at that time there was no other person present; that just prior to picking up the deed the defendant was talking about some Equitable stock which the witness was thinking of taking; and that about January 20, 1905, the defendant called upon him, saying that the reason he did not tell him anything about Mrs. Burbank's deed was because she was capable of conducting her own business, and did not care to have her transactions known. Charles Bynum testified that January 7, 1905, he was employed in a livery stable at McMinnville, from which city he rode in a buggy with the defendant to Lafayette, where Mrs. Burbank then lived; that the defendant returned with him part of the way and on the road remarked to him that he had purchased a farm for $8,000 from her for some person in California who expected to raise walnuts on the land.

The defendant, as a witness in his own behalf, testified that Mrs. Burbank requested him to find a purchaser, if possible, for her farm, saying she expected to leave her property to some charitable institution, and was anxious to settle her business affairs, so as to secure a permanent income; that January 2, 1905, she agreed to sell the farm for $8,500 and accept therefor Alarm stock of the face value of $7,500, and the remainder in cash; that she looked over her papers to find the deed of the premises, but being unable to discover it she asked him to assist her in the search, and doing so, he found a lease of the farm from which she said a description of the premises could be obtained; that he took the lease, promising to return in a few days with a deed of the premises prepared for execution; that five days thereafter he again visited Mrs. Burbank, telling her that he had been disappointed in a business venture whereby he expected to secure the sum of $1,000 with which to pay the cash part of the consideration for the land; that in lieu of such payment she agreed to accept his promissory note for that sum payable in a year with interest, which he executed and also assigned to her Alarm stock of the face value of $7,500 and delivered the same to Mrs. Burbank, who placed such writings in an envelope; that when the deed was executed he put it in his pocket and thinks she saw him doing so; that he thereafter

exhibited the deed to her, after the notary public left the house, saying that if the abstract, which he had ordered, should show that the instrument was insufficient, for any reason, to convey the legal title to the premises intended, she would be expected to execute a quitclaim deed to correct the matter, to which she replied, "Certainly;" that there never was any agreement whereby she was to receive the sum of $4,000 in cash; that the contract to assign to her Alarm stock of the face value of $7,500 was the only agreement ever entered into January 2, 1905, and which was thereafter modified only in respect to giving a promissory note for the sum of $1,000 in lieu of the cash. The defendant admits that he told Bynum that he had purchased Mrs. Burbank's farm, for an equivalent of $8,000 in cash and would receive a commission of 5 per cent on account thereof, but that he did not remember saying that he had a partner in the transaction. He also admits that the first time Mrs. Burbank spoke to him about desiring to sell her farm she stated that she would take $8,500 for it and accept $4,000 thereof in cash and the remainder on time, saying: "That conversation occurred several times." .

Mrs. Burbank, on rebuttal, testified that she never saw the deed after she signed it and left it on the table; and that the defendant did not thereafter take the instrument from his pocket or ask her to make a quitclaim deed. It further appears that when the deed was signed, Mrs. Burbank was 77 years old and her physician, Dr. E. E. Groucher, who had known her about 25 years, testifying as to her condition at that time, said that she had been sick and was feeble. Mrs. Mamie Cone, who, with her husband, was keeping house for the plaintiff, January 7, 1905, testified that at that time Mrs. Burbank was not at all well. Mrs. Burbank did not tender to the defendant the note which he drew in her favor or the certificates of stock which he had assigned to her, nor were they deposited in court for him. She wrote him, however, January 12, 1905, when this suit was instituted, to call at her home and take them away and to return to her the deed which he had taken.

1. It is contended by defendant's counsel that, the complaint

having alleged that the remainder of the purchase price of the land, in excess of $4,000 in cash, was to have been paid by the delivery of shares of stock of the American Alarm Co., the plaintiff was bound by such averment and therefore estopped to deny it, which, as a witness, she did by testifying that no agreement had ever been entered into with the defendant whereby any part of the consideration was to be paid in stock. The testimony referred to was brought out on cross-examination by defendant's counsel, who did not move to strike it out as immaterial, or object to it in any manner. Nor was any motion made by plaintiff's counsel to amend the complaint so as to make it conform to the testimony given. In this condition of the record, it must be assumed, after decree, that the cause was tried as though the issue was regularly made, which being germane to the cause, it is now too late to invoke the legal principle insisted upon.

2. It is maintained by defendant's counsel that the complaint stated that the deed was obtained by fraudulent representations and without consideration, and, as the prayer for relief is that the sealed instrument be surrendered so that it may be destroyed, the suit is for the cancellation of a deed, but as plaintiff retained the stock and promissory note, she was not entitled to any equitable alleviation until they were returned or tendered to the defendant, and hence an error was committed in rendering the decree complained of. In all cases of rescission the parties who would be affected thereby must be placed *in statu quo* as an incident to the abrogation of their agreement, which necessitates a return or tender by the injured party of all property, rights or franchises that may have been received as the consideration for an executed contract, before a court is authorized to grant the relief asked, on the theory that he who seeks equity must do equity. Rescission always implies that a contract has been duly executed, the binding force of which is attempted to be avoided by one of the parties in consequence of some act of the other. If a party were compelled by force or fear to exchange any of his property for that of another, he would not be required to return or tender that which

had been imposed upon him as a condition precedent to securing his own, because there had never been a meeting of their minds whereby a consent to the interchange was given. The delivery of a deed of real property is the last act of a grantor that serves to transfer his title to the premises and evidences the *aggregatio mentium* of the parties respecting the entire subject-matter of the contract. Until such delivery has been made by the grantor or by some person authorized to surrender possession of the deed for him, the contract to convey real property has never been executed, and in such case, if the grantee surreptitiously, or without the consent of the grantor, obtains the sealed instrument, no title passes. If Mrs. Burbank's deed was not delivered, the certificates and the note which were left in her house by the defendant would not impose on her the duty to return or tender them, unless she consented to accept them as the consideration for the conveyance.

An examination of the averments of the complaint and of the prayer for relief might seem to support the contention of the defendant's counsel that this suit was instituted to cancel a deed, but when the pleading is construed according to the liberal rules which the statute prescribes (B. & C. Comp. § 85), we think the allegations referred to were inserted as matters of inducement to illustrate the situation of the respective parties and that the part of the prayer mentioned should be regarded as the court treated it, as an inadvertence. This being so, if the defendant attempted to impose on Mrs. Burbank by taking the deed without her knowledge or consent and leaving the stock and note, she was not obliged to return or tender them to him, nor even write him, as she did, to take them away from her house, for if he chose to leave his property under the circumstances supposed, his voluntary act was tantamount to an abandonment, for which he alone is responsible.

3. The executed deed having been found in the possession of the defendant, who is the grantee named therein, a presumption arises that the sealed instrument was regularly delivered, and the burden of overcoming this disputable presumption, which results from such fact, is imposed on the person alleging to the

contrary: *Flint* v. *Phipps,* 16 Or. 437 (19 Pac. 543) ; *Tyler* v. *Cate,* 29 Or. 515 (45 Pac. 800) ; *Swank* v. *Swank,* 37 Or. 439 (61 Pac. 846).

4. The delivery of a deed is accomplished by the grantor's voluntarily passing it to the grantee or handing it to some person for him, or by the grantor's doing or saying something by means of which he discloses an unmistakable purpose to part with all control over the instrument and thus forever to put it out of his power to regain possession thereof: *Fain* v. *Smith,* 14 Or. 82 (12 Pac. 365, 58 Am. Rep. 281) ; *Allen* v. *Ayer,* 26 Or. 589 (39 Pac. 1) ; *Hoffmire* v. *Martin,* 29 Or. 240 (45 Pac. 754).

The testimony fails to show that Mrs. Burbank handed the deed to the defendant or to the notary public for him, or that she said or did anything that could possibly be construed as an intent irrevocably to surrender the possession of the instrument. The defendant testified that in the presence of Mr. Olds, the notary public, he took the deed, just after Mrs. Burbank signed it, and in answer to the inquiry, "Did she see you take the deed?" he replied, "I think she did. She was sitting facing me." It will thus be seen that the testimony of the defendant overthrows the presumption which the law raises from his possession of the deed. It will be remembered, however, that he testified that after taking the deed and putting it in his pocket, he exhibited it to Mrs. Burbank, who said that if the description of the premises should prove incorrect she would execute a quitclaim deed to rectify the mistake. This is the entire testimony of the defendant on the question of delivery. Mrs. Burbank testified that she did not see the defendant take the deed, and that he never exhibited it to her or asked her to make a quitclaim deed. This dispute leaves for consideration the question of the probable preponderance of testimony as between the plaintiff and the defendant. The method pursued by the defendant to gain the confidence of Mrs. Burbank, whom he had met only two or three times in a business matter, by soliciting her to visit and spend a week with his wife, who had not even seen her, and justifying his invitation on the plea of the love

of orphans for, and their desire to promote the happiness of, aged people, would seem to show a personal interest in Mrs. Burbank's welfare not disclosed by his letter, when it is remembered that she possessed considerable means.

The circular issued by the American Alarm Co., showing what vast sums of money might be realized by purchasing its capital stock, was well calculated to excite the interest of an aged and feeble woman, who desired to place her property so it would best subserve the maintenance and education of orphans, thereby inducing her to agree to accept such stock, in excess of $4,000, as equaled the estimate she placed upon her farm. It is not intended to say anything disparaging about the stock of the corporation, for the patent owned by it is undoubtedly valuable, thus making its assets greater than would appear from the value of its tangible property. The alarm manufactured by the company is useful and as it is retailed at a moderate price, the sales thereof ought to be extensive, but whether or not the expectations of the incorporators respecting such sales as indicated in their prospectus, will ever be realized is problematical. It is probably true that what is said in the circular of the company as to the value of its stock is only a matter of the consensus of opinion of the incorporators, the roseate hues of which reflect their ardent desires and upon which purchasers of stock ought not to rely. Mrs. Burbank, however, by reason of her inexperience in business and her extreme age and infirmity was unable to resist the allurements of the company's prospectus which she had received, or wholly disregard the blandishments of the defendant, who told her she was a person of such wealth that her influence was a sufficient consideration for the assignment to her of one share of stock.

Not any one particular act of the defendant hereinbefore adverted to is sufficient, perhaps, to overcome his declarations under oath, respecting the delivery of the deed, but when all are considered and his conduct towards Mrs. Burbank is viewed in the light of his interest, we believe her testimony on the particular subject involved preponderates, and, this being so, the decree is affirmed.                    AFFIRMED.