Argued January 20, affirmed March 4, 1953

BINGHAM ET UX. *v.* WEBER and LINN ET UX.

254 P. 2d 219

*James H. Ganoe,* of Portland, argued the cause for appellants. With him on the briefs was Millen F. Kneeland, of Portland.

*John C. Caldwell,* of Oregon City, argued the cause for respondent. With him on the brief were Beattie & Hibbard, of Oregon City.

Before WARNER, Acting Chief Justice, and LUSK, BRAND and PERRY, Justices.

WARNER, A. C. J.

This is a suit for the partition of 17 acres of real property in Clackamas county, Oregon. It is instituted by the plaintiffs, George E. Bingham and his wife Laura, against the defendant, Amalie Weber, a widow. During the course of the trial, it was stipulated that the defendants Linn were neither necessary nor proper

parties. From a decree adjudging Mrs. Weber to be the owner of the entire fee in the property and an order dismissing the Binghams' complaint, the plaintiffs appeal.

All the parties claim their respective titles or color of title through heirs of Joseph Schmidt, deceased, who was the owner of the fee in the subject property at the time of his death intestate on December 17, 1933.

On February 26, 1943, the Binghams instituted a suit against certain alleged German heirs of Joseph Schmidt. The decree in that suit becomes the basis of their claim in the instant matter that they are the owners of an undivided six-sevenths interest in the real property in dispute. Mrs. Weber, the defendant here, was not made a party in their suit of 1943. The judgment roll in that litigation, hereinafter referred to as the suit of 1943, is a part of the record in the matter at bar. It is the cornerstone upon which the Binghams here seek to support their case. Later, we will have much to say concerning it.

After the entry of an amendatory decree on December 21, 1945, in the suit of 1943, the Binghams on the same day filed their complaint in this matter. In this partition suit they allege an undivided six-sevenths interest in themselves and an undivided one-seventh interest in the defendant Weber and pray for a partition of the premises between the parties in accordance with such moieties. As evidence of plaintiffs' right, they rest upon the decree in the suit of 1943.

The defendant Weber filed an answer and counter-claim praying for a decree quieting title in her as to the entire fee on the basis of adverse possession. It is Mrs. Weber's contention that she, together with her immediate predecessors in interest, was, as of the date of the filing of plaintiffs' suit in partition and

for more than ten years prior thereto had been, in actual, open, notorious, continual and hostile possession of the real property which was the subject both of the suit of 1943 and of the case at bar. This possession, Mrs. Weber says, is and was under claim of right and claim of ownership to the whole property and with color of title. She alleges that such possession had continued since March 23, 1935.

We pause here to observe that if the possession asserted by Mrs. Weber had continued without interruption by any tolling of the statute of limitations upon which she relies (§ 1-202, OCLA), then her title as claimed would have ripened and become invulnerable against the claim of any interest of the Binghams or their predecessors, unless successfully assailed by them before March 23, 1945.

Briefly stated, the case for the defendant Weber is predicated upon the following: Jacob Schmidt, a brother of the former owner, Joseph Schmidt, was living in Spokane, Washington, at the time of Joseph's demise. Representing himself to be the sole heir of Joseph Schmidt, Jacob, shortly after his brother's death, petitioned the probate court of Clackamas county in January, 1934, for the appointment of a resident administrator. The Schmidt estate was closed in February, 1935. Jacob, as the only apparent heir of record and sole owner of the property in dispute, on March 23, 1935, conveyed the same by warranty deed to John Weber and his wife Amalie (the defendant-respondent) as tenants by the entirety. This deed from Jacob was duly recorded three days afterward, and the Webers then began the period of the continuous adverse possession upon which the defendant here relies. In addition, the defendant Weber's proof shows that she or her husband made substantial outlays for

the improvement of the premises and paid all the taxes assessed during the period of their holding. Mr. Weber died on July 15, 1940.

It does not appear from the record before us that the plaintiffs here or the German heirs of Joseph Schmidt, as their predecessors in interest who were the defendants in the suit of 1943, had on or before March 23, 1945, made any effort of any kind to claim possession or title adverse to the claim of the defendant Weber. Indeed, the plaintiffs Bingham do not appear to question that Mrs. Weber and her husband were in actual possession of the property under their warranty deed or that 10 years, 8 months and 26 days had not elapsed between the date of the deed's recording and the date of the filing of the Binghams' complaint in this suit for partition. The plaintiffs, it will appear, depend entirely upon the operation of § 1-217, OCLA, a tolling statute, for the preservation of their right to bring this litigation within the period prescribed by § 1-202, OCLA.

It is the position of the plaintiffs here that Jacob Schmidt, the only brother of the deceased Joseph then residing in the United States, misrepresented the true status of heirship in the probate proceeding of 1934-1935. The Binghams claim that Joseph, when he died, left brothers and sisters and children of deceased brothers and sisters surviving him, all of whom, except Jacob, were then and thereafter nationals and residents of Germany. The Binghams assert that these German heirs owned, by reason of Joseph's death, the aggregate of an undivided six-sevenths interest in the real property which is sought to be partitioned in this matter and that they, the Binghams, acquired the entire interest of the German heirs by purchase pursuant to negotiations begun prior to March, 1941.

The conditions attending the closing of that purchase and sale are made the subject matter of the suit of 1943 and will become more apparent when we later examine the record of that case with greater particularity. Under plaintiffs' theory of the case, Jacob Schmidt inherited not the whole of Joseph's estate but only an undivided one-seventh interest therein and that was the only moiety he could and did convey to the Webers under his deed of March, 1935.

The real questions here in terms of fact are: When was the transfer of such title as the German heirs may have had in the premises consummated? Was it as of the delivery in Germany of the deeds to the Binghams, or was it conveyed as of the date of the decree in the suit of 1943? To pinpoint the problem: Was title vested in the Binghams before or after December 11, 1941, the date of the declaration of war by the United States against Germany (55 Stat 796, ch 564, pt 1)? If before the declaration of war, the statute tolling the operation of the statute of limitations was inoperative; but if it was after that historic date, then § 1-217, OCLA, became effective and rendered nugatory any defense which the Webers might otherwise have pleaded under the statute of limitation.

The Binghams assert that § 1-202, OCLA, which inhibits the commencement of an action for the recovery of real property or the possession thereof after ten years, had been tolled by § 1-217, OCLA. This statute provides: "When a person shall be an alien subject or citizen of a country at war with the United States, the time of the continuance of the war shall not be a part of the period limited for the commencement of the action."

It is, therefore, evident that if the German heirs of Joseph Schmidt after December 11, 1941, were

vested in title to any part of the 17 acres which are here sought to be partitioned, their right to bring an action adverse to the defendant Weber and designed to protect their alleged interest in and to the property occupied by Mrs. Weber continued unaffected by § 1-202, OCLA, from that date to and during the continuance of the war then begun between Germany and the United States.

On the other hand, it is equally obvious that if the German heirs parted with their title or claim of title in and to the subject property before December 11, 1941, and the same became vested before that date in grantees who were not alien subjects or citizens of a country at war with the United States, then the provisions of § 1-217, OCLA, are not applicable in aid of the plaintiff grantees.

Moreover, if the German heirs of Joseph Schmidt conveyed their title to the premises in dispute to the Binghams at a time subsequent to December 11, 1941, then the tolling of the limitation imposed by § 1-217 terminated as of that later date.

In their brief, plaintiffs state their position in this manner:

"* * * The decree establishing appellants['] right as successors in interest to the german [sic] heirs was not entered until October 2, 1945. The period between December 11, 1941 and October 2, 1945 amounts to more than three years. Deducting this period of suspension of the statute leaves respondents' claim of adverse possession resting upon a period of less than seven years,—far short of the statutory period."

In short, the plaintiffs do not here claim under the deeds which they say in their complaint in the suit of

1943 had been delivered but rather under the decree entered in that suit.

In arriving at our solution, we must, because of want of any other evidence, depend upon what is revealed by the record in

### The Suit of 1943.

In the suit of that year, jurisdiction of the parties defendant was obtained both by publication and by the acceptance of service in their behalf by the Alien Property Custodian of the United States, acting under the authority of Executive Order No. 9095, as amended, and in accordance with General Order No. 6, issued pursuant thereto. Upon the issues joined, a decree was entered on October 2, 1945, wherein provision was made that the decree should stand in lieu of the "lost deeds", and the plaintiffs Bingham (also plaintiffs here) were adjudged to be the owners in fee simple of an undivided seven-eighths interest in the real property. By stipulation of the parties, the moiety of seven-eighths was corrected by an amendatory decree of December 21, 1945, to be six-sevenths.

Turning to plaintiffs' complaint in that case, we find an allegation outlining the negotiations had by and between them and the German heirs for the purchase and sale of an undivided six-sevenths interest in the subject property. The pertinent paragraphs upon which they there rest their assertion of title, later confirmed by the decree in that suit, are:

### "VI.

"That during the month of March, 1941, Robert G. Clostermann was the duly appointed, acting and qualified consul of Germany for the State of Oregon and the duly authorized and appointed attorney in fact, both by virtue of the treaty then existing

between the United States of America and the government of Germany and by reason of specific appointment, for all of the heirs of Joseph Schmidt, deceased, and their respective spouses, other than Jakob [also 'Jacob'] Schmidt of Spokane, Washington, and that, acting in his official capacity as consul and attorney in fact for said heirs, the said Robert G. Clostermann negotiated a sale for and on behalf of all of the heirs of Joseph Schmidt, deceased, and their respective spouses, other than Jakob Schmidt and his wife of Spokane, Washington, to the plaintiffs herein of the undivided seven-eights [sic] [later corrected to six-sevenths] interest vested in said heirs of Joseph Schmidt (being all of the heirs other than Jakob Schmidt of Spokane, Washington) in and to the real property hereinbefore described, and that on March 3, 1941, the said transaction was completed and closed by the payment in cash by the plaintiffs to Robert G. Clostermann, as consul of Germany and attorney in fact for the said heirs and their respective spouses, of the purchase price agreed upon.

"VII.

"That plaintiffs are informed and believe and on information and belief allege that thereafter all of the said heirs and their respective spouses, being all of those persons named as defendants herein, made and executed in favor of the plaintiffs herein and delivered to said plaintiffs by depositing in the mail in Germany, as and for delivery to plaintiffs, their deeds conveying the said property to plaintiffs herein, but that by reason of the intervention of a state of war between Germany and the United States, said deeds have never reached the plaintiffs herein.

"VIII.

"That by virtue of the payment of the purchase price and the execution and delivery of said deeds, plaintiffs are now the owners in fee simple of an undivided seven-eights [sic] [six-sevenths] interest in and to the real property herein described."

Before we go further, it is a matter of special interest to determine by examination of the complaint and theory of and

### *The Character of Equitable Relief Sought by the Suit of 1943.*

■ Thus we are able to interpret more accurately the intent, scope and force of the decree. It is elementary law that the relief granted must necessarily be responsive to and in conformity with the pleadings and proof. *State ex rel. Dean v. Dean,* 136 Or 694, 697, 300 P 1027, 86 ALR 79; *Reed v. Hollister,* 106 Or 407, 415, 212 P 367; *Treadgold v. Willard,* 81 Or 658, 663, 160 P 803.

The necessity for this inquiry and determination is dictated by the importance which the plaintiffs attach to the date of the decree (October 2, 1945). In their brief we find: "* * * Having jurisdiction of the subject matter and the parties, its final decree [i.e., the decree in the suit of 1943] effectively denuded the defendant heirs of their interest in the property and established that interest in appellants. * * *." The failure of the circuit court to accept this thesis is made an assignment of error. Whether the lower court was right or wrong in this respect depends to no small degree upon the legal theory and character of their suit of 1943 and the relief the plaintiffs sought to attain thereby.

The defendant Weber treats the suit of 1943 as one to quiet title. The plaintiffs assert that it is "one partaking of the nature of a suit for specific performance." We think neither analysis is correct.

Because of the character which we hereinafter ascribe to the proceedings of 1943, we find it not neces-

sary to demonstrate why we cannot concur in its designation as a suit to quiet title.

It is more readily evident to us why the action of 1943 was not a suit for specific performance or even one in the nature of a proceeding of that kind. The contract between the plaintiffs and the defendant Schmidt heirs is pleaded in Paragraph VI of the complaint. It required the payment of the purchase price by the Binghams as vendees and the delivery of a deed or deeds by the Schmidt heirs as vendors to render it completely executed. Any doubt that all parties to that agreement had completely fulfilled their respective obligations is set at rest by Paragraphs VI, VII and VIII, particularly by the latter paragraph in which plaintiffs allege that the purchase price required of them has been paid and the delivery of the deeds from the defendant Schmidt heirs has been completed. Reading the three paragraphs together dispels any doubt in this respect.

■ What, then, was the nature of the suit brought by the Binghams against the Schmidt heirs in 1943? In our opinion, it was a suit to re-establish lost instruments (deeds, in that instance) which were delivered by the Schmidts to the Binghams by "depositing in the mail in Germany, as and for delivery to plaintiffs [Binghams]" but which deeds were lost or destroyed by "the intervention of a state of war between Germany and the United States". This conclusion finds support in the prayer of the complaint where one of the items of relief sought is that the "decree stand in lieu of *the lost deeds*". (Italics ours.) The prayer in this respect is reflected in the decree where we find a provision that the "decree stand in lieu of the deeds * * * which are now lost".

■ A decree for the re-establishment of a lost or destroyed instrument is today's judicial voucher for the existence of a document which was a part of and evidenced yesterday's transactions so that those entitled to rely thereon may do so confidently and without delay in the furtherance of tomorrow's business and, to the same extent, as if the original of such instrument had not been rendered unavailable by loss or destruction.

■■ As a general rule, the loss or unintentional destruction of a written instrument in no way affects the validity or sufficiency of the transaction which it evidences or the rights or liabilities of those who are parties to it. 54 CJS, Lost Instruments, 802, § 2. The court only relieves against the accident by setting up the evidence of the instrument lost. Its decree adds nothing to or subtracts nothing from the pristine character of the instrument re-established. In 54 CJS, Lost Instruments, 818, § 16, it is said:

> "The effect of establishing in equity a lost instrument is to restore it to its original vigor and power * * *. However, an established instrument is not clothed with any greater force than if it had not been lost; and any defense which might have been made to the original instrument may be set up in an action on the established instrument."

■ It, therefore, follows that when a lost deed is restored by decree, the deed so re-established does not take effect from the date of the decree of its re-creation but relates back to the time of the making of the lost deed and gives effect and validity to such lost deed. *Wyman v. Hageman,* 318 Ill 64, 148 NE 852, 856.

■ These observations drive us to the conclusion that the date of the decree in the suit of 1943, so heavily

relied upon by plaintiffs, avails them nothing in the instant litigation. Such title as the Schmidt heirs had in the property was transferred by delivery of their deeds and not by the decree. This, however, does not complete our inquiry. We are still left with the necessity of determining

### The Date of Delivery of the Deeds from the German Heirs.

Was this before or after December 11, 1941?

■ The delivery of a deed which has been knowingly executed with the intention of transferring title completes the transaction so far as title is concerned and vests the title in the grantee. 7 Thompson, Real Property perm ed, 555 et seq., § 4110. That there was an acceptance of delivery of the Schmidt deeds by the Binghams is made evident by their reliance upon these deeds as delivered as the very basis for their suit of 1943. This acceptance related back to the date of the deeds' delivery. 26 CJS, Deeds, 254, 256, § 51; 1 Am Jur, Deeds, 621, § 324.

■ The delivery of a deed is completed when the grantor has put it beyond his power to reclaim. *Jobse v. U. S. Nat. Bank,* 142 Or 692, 696, 21 P2d 221; *Norton v. Norton,* 105 Or 651, 654, 209 P 1048; *Dieckman v. Jaeger,* 87 Or 392, 394, 170 P 727; *Pierson v. Fisher,* 48 Or 223, 233, 85 P 621; 26 CJS, Deeds, 237, § 42; 16 Am Jur, Deeds, 508, § 125; 7 Thompson, Real Property perm ed, 623, § 4160. It can be accomplished by deposit in the mails, directed to the grantee. 26 CJS, Deeds, 237, § 42; 16 Am Jur, Deeds, 508, § 125.

The date of delivery thus being controlling, we press our inquiry to ascertain from the record here, if possible, when that delivery became such a consum-

mated fact as to render the Bingham-Schmidt contract to purchase and sell an executed agreement. We again revert to the complaint in the 1943 suit.

It is not necessary to the solution of the problem before us that we fix the precise date upon which the delivery of the deeds by the Schmidt heirs was accomplished. Our prime interest is whether or not the statute of limitations (§ 1-202, OCLA) then operating in favor of the defendant Weber had been tolled by the provisions of § 1-217, OCLA, prior to the delivery of the Schmidt deeds to the Binghams. If delivery was made prior to December 11, 1941, the date of the declaration of war against Germany, then it is obvious that the operation of the statute of limitations continued uninterrupted and without repose, and no advantage thereby accrued to the Binghams which they can successfully assert in this partition suit to overcome the defendant Weber's claim of title to the whole parcel by reason of adverse possession.

Before proceeding further, we note the statement of the Binghams found in Paragraph VI of their complaint in the suit of 1943. They there allege that on March 3, 1941, they made payment of the purchase price. It then follows that from March 3, 1941, to December 11, 1941, the Schmidt heirs had a period of but a few days longer than nine months in which to complete legally their part of the sales bargain by making delivery of their deeds.

We are of the opinion that the only reasonable construction that can be accorded to Paragraph VII of the Bingham complaint hereinbefore quoted is: The deeds were deposited in the post office in Germany prior to December 11, 1941, though possibly close to that date. It is not there alleged that war preceded the act of delivery of title by depositing in the mail

but, to the contrary, the allegation is that after the act of legal delivery had been completed, war intervened to interrupt the mechanics of a completed transmission of the deeds to the Binghams in the United States, an intervention of such character that it resulted in the loss or destruction of the deeds legally mailed. This loss, of course, might have happened within or without Germany at any time after the deeds were mailed.

There are several things in the record which give cogent warranty for the foregoing conclusion concerning Paragraph VII. Aside from what is said in that paragraph regarding the subject of delivery, plaintiffs in Paragraph VIII make a forthright and unequivocal allegation that delivery of the deeds was an accomplished fact which vested in them an "undivided seven-eights [sic] interest in and to the real property". Not only do the plaintiffs there assert ownership as a result of such delivery but their very assertion gives rise to the presumption that the delivery upon which their claim of title rests was a legal delivery, that is, one not proscribed by any law, particularly legislation in force by reason of the war which from December 11, 1941, subsisted between the United States and Germany.

Indeed, the lower court would have been powerless to have rendered the relief requested and granted in the suit of 1943 had there been no delivery of deeds from the German heirs. There would have been no "lost deeds" to restore or establish nor any right in the Binghams to have claimed title to the premises based thereon. Unless there had been a legal delivery, as the court in that suit must have found, there would have been no justification for directing that the decree in the 1943 suit should stand in lieu of the *lost deeds*.

Moreover, had the delivery contravened any law in force at the time of the actual delivery which operated against the defendants taking title, then the court would have been equally impotent in rendering the decree which it did, and it would be valueless to plaintiffs in their attempt to establish in the instant matter any species of ownership or right adverse to the possession claimed by the defendant Weber in this case.

In their brief, the plaintiffs state a new and different position entirely at variance with the allegations of their complaint in the suit of 1943 for the reestablishment of their lost deeds and one definitely at odds with their reliance here upon the decree obtained in that suit. In their reply brief, we find this statement:

> "* * * We do not dispute that from the record it is plain that the deal which he [Robert G. Clostermann] negotiated was acceptable to the heirs and that they executed and *attempted to deliver deeds, but, the attempt to deliver was inneffective* [sic] *because of the interposition of a state of war*. Up to the point of actual consumation [sic] of the transaction, all was legal. At that point under the law of nations the completion of the contract became illegal on the part of the German heirs. * * *.
> "* * * The deeds were not *delivered* and the consideration did not pass until the vesting order of the Alien Property Custodian. *Being illegal, an attempt to deliver was wholly ineffective. * * *.*" (Italics ours.)

This is an attempt to impeach and contradict the very decree upon which they rely, a species of attack which cannot be properly made in this suit.

In support of this assertion of illegality, they rally the Trading with the Enemy Act (Tit 50 App USCA).

That Act did not become effective as a bar to any transaction between the Binghams and the German heirs of Schmidt because of war until midnight on December 11, 1941 (Tit 50 App USCA, § 2), a time which, as disclosed by their own pleading, must have been subsequent to the delivery of the Schmidt deeds. Being so, reference to the Trading with the Enemy Act is of no help to their cause in this appeal.

We also think it is not without significance that the Alien Property Custodian, who properly entered an appearance in behalf of the German heirs, did not take any steps to vest the alleged interest of the German heirs in the land in controversy but, instead, issued as his only vesting order one against the fund representing the purchase price paid by the Binghams to Robert G. Clostermann, the Schmidts' resident attorney in fact, a fund which the German heirs would not have been entitled to receive in the absence of a delivery of their deeds conveying their interest in the property.

■ We, therefore, hold that such interest as those heirs of Joseph Schmidt, deceased, who were parties defendant in the suit of 1943, had in the property here involved was transferred to the Binghams, plaintiffs herein, on some date subsequent to March 3, 1941, and prior to the declaration of war on December 11, 1941, and that the statute of limitations (§ 1-202, OCLA) had not been tolled by § 1-217 prior to the time that the Binghams acquired such interest as the Schmidt heirs may have had therein.

In the earlier part of this opinion, we stated that unless interrupted by the tolling of the statute, the possession of the property by Mrs. Weber and her predecessors would ripen into a title by adverse possession on March 23, 1945. The first and only claim of the plaintiffs asserted adversely to the defendant Weber

was made by the filing of their complaint in the partition suit at bar. That, as we have noted, was on December 21, 1945, and, therefore, too late to be of avail in this matter.

The only other matter compelling attention is appellants' claim that the Webers during the period of adverse possession made certain statements giving recognition to the title alleged to have been vested in the heirs of Joseph Schmidt and thereby created, they argue, a fatal interruption of the continuity of their adverse possession. Our examination of the entire record warrants the conclusion that this proposition of plaintiffs is without merit.

AFFIRMED.