[Civ. No. 923.    Third Appellate District.—April 25, 1912.]

ANDREW J. PIERCY, as Administrator of the Estate of MARY J. PIERCY, Deceased, Respondent, v. EDWARD M. PIERCY, Appellant.

ACTION TO SET ASIDE DEED FROM AGED MOTHER TO SON—UNDUE INFLU-ENCE—ABSENCE OF INDEPENDENT ADVICE—INCAPABILITY OF UNDER-STANDING—SUPPORT OF FINDINGS.—It is held, upon a review of the evidence in this action to set aside a deed from an aged mother to her son, on the ground of undue influence, that the findings that the deed was obtained by undue influence, and was not voluntarily delivered, and that by reason of her old age and mental weakness she was incapable of transacting or understanding business trans-actions in a thoroughly intelligent manner, and was particularly incapable of properly understanding the nature, effects and conse-quences of any act regarding the transfer of real property, without independent advice and careful explanation thereof, and that she had no independent advice, were properly sustained by the evidence.

ID.—CONFIDENTIAL RELATION BETWEEN SON AND MOTHER—INFERENCE OF UNDUE INFLUENCE—SUPPORT OF JUDGMENT SETTING ASIDE DEED WITHOUT CONTRARY SHOWING.—Where the son lived with his mother, hired her servants, and had been for a long time the manager of her property, and for years her agent holding her general power of attorney, it is held that the confidential relation so existing be-tween them would warrant the inference of undue influence on the part of the son in obtaining a deed of real property from his mother, which would constitute sufficient support for the judgment of the

superior court in setting the deed aside, without a clear showing which would rebut such inference. In the absence of such clear and convincing proof, the conveyance is presumed to have been obtained by undue influence and to be void.

ID.—INDEPENDENT ADVICE—BURDEN OF PROOF TO REBUT INFERENCE.— Persons standing in a confidential relation toward others cannot entitle themselves to hold benefits conferred upon them unless they can show to the satisfaction of the court that the person by whom the benefits have been conferred had independent advice in conferring them, which had been given in private by some one of the grantor's own selection, when the grantor was not surrounded with dominating influences favoring the transfer; or, at least, must assume the burden of showing to the entire satisfaction of the court that the gift was made freely and voluntarily, with full knowledge of the facts, and with entire understanding of the effect of the transfer.

ID.—PRESUMPTION OF UNDUE INFLUENCE NOT OVERCOME—PRESUMPTION CONFIRMED BY POSITIVE EVIDENCE OF DOMINATION.—It is held, in view of all the evidence, impossible to rule that the court should have been convinced, or that it should have determined, that the presumption of undue influence was overcome, and that the asserted conveyance should be held valid, but, on the contrary, there is strong proof, actual and circumstantial, to show the dominating influence of the defendant over his mother.

ID.—SUPPORT OF FINDING AS TO NONDELIVERY OF DEED—SUBSEQUENT RECORD NOT PROOF—QUESTION OF FACT—INTENTION OF GRANTOR.— It is held that the finding that there was no intentional or actual delivery of the deed by the purported grantor is sufficiently supported by the evidence. The subsequent recording of the deed by the purported grantee is not a delivery, unless it comes from the hand of the grantor, or someone claiming through or under the grantor. The delivery of the deed is a question of fact, depending upon the intention of the grantor as to passing title. But the court might rationally conclude from the evidence that the grantor neither said nor did anything to indicate an intention to deliver the deed, or to pass the title.

ID.—EVIDENCE—TESTIMONY OF ATTORNEY AS TO CONVERSATION BETWEEN ATTORNEY AND BOTH PARTIES—RELATION OF ATTORNEY TO PARTIES IMMATERIAL.—The testimony of the attorney who drew the deed was admissible to prove a conversation participated in between himself, the grantor and the grantee, regardless of whether he was the attorney solely of the grantor, or of the grantee, or of both parties. In either case, the other party may require him to testify to such conversation.

ID.—EVIDENCE OF FRAUD—DELAY AND ATTEMPTED SECRECY IN RECORD OF DEED.—The conduct of the defendant in long delay and in attempted secrecy of the record of the deed was admissible as tend-

ing, if unexplained, to show a consciousness of fraud in the obtaining of the deed, and to indicate a purpose to avert any suit to set aside the deed until after the death of the grantor.

ID.—AFFIDAVIT OF GRANTOR AGAINST SUIT TO SET ASIDE DEED—REBUTTAL—PROOF BY ADMINISTRATOR OF CONTRARY DECLARATIONS.—Where the grantor was induced by the son to make an affidavit that her suit to set aside her deed to the son was unauthorized, and that she did not employ the attorney who brought it, and that she did not fully understand the nature of the proceedings, it was proper for her administrator, who carried on the suit after her death, to rebut such affidavit by proof of her contrary declarations that she did understand the situation and that her purpose was as indicated by the complaint filed. Such declarations are within the rule declared in section 1850 of the Code of Civil Procedure, and the principle that words so connected with and illustrative of an act as to elucidate and define its character are considered as appertaining thereto, and admissible to clarify the same.

ID.—GENERAL RULE AS TO EVIDENCE OF DECLARATIONS BEFORE AND AFTER DEED—STATE OF MIND—QUESTION OF REMOTENESS.—It is a familiar rule of evidence that when a grantor's mental condition on the date of a deed is in issue, a showing may be made of his mental condition both before and after its date, as indicative of the probable mental condition of the grantor at the date in question. It is only necessary that the matters testified to be sufficiently near in point of time in order that the testimony may be of value in determining the question directly in issue. The question of remoteness is one for the court to determine, and the weight of the testimony is to be governed according to the facts. The state of mind at one time is competent evidence of its state at other times, not too remote, because mental conditions have some degree of permanency.

APPEAL from a judgment of the Superior Court of Santa Clara County, and from an order denying a new trial. J. R. Welch, Judge.

The facts are stated in the opinion of the court.

W. F. Williamson, and John W. Sullivan, for Appellant.

John E. Alexander, and Beasly & Fry, for Respondent.

BURNETT, J.—By a verified complaint this action was begun by Mary J. Piercy to set aside a deed in which she was the grantor and her son, Edward M. Piercy, the grantee, and after her death, the administrator, another son, was substi-

tuted as the party plaintiff. The consideration for the deed was "love and affection."

The trial court found in favor of plaintiff, adjudging the deed void on the ground that it was obtained by undue influence. There was also a finding that the deed was not delivered. Both theories were adequately presented in the complaint, and it is manifest that the finding as to each is sufficient to uphold the judgment. From an examination of the record we are satisfied also that it must be held that the material findings of the court are amply supported by the evidence.

The following facts, fairly deducible from the testimony, favorable to respondent—some of which are indeed not disputed—are sufficient to reveal the character of the controversy: On March 30, 1901, the date on which the deed was signed by Mary Piercy, she was eighty-five years old or over. For ten or twelve years prior thereto she could not walk without assistance, could not dress herself and she was most of the time in bed. She was not able to attend to her household duties. If she walked from one room to another she would be exhausted, and she was not able to get about without having some one with her. She was afflicted with a kidney or bladder disease that was the occasion of constant trouble and annoyance. At the time of the transaction in reference to the deed she was bedfast, and was so weak that she had to be helped to sit up in bed to sign the instrument. As to her bodily condition, looking through the testimony of her children, we behold an old lady, enfeebled by years and disease and trouble, needing constant assistance, unable to supply her own wants and entirely dependent upon the care of others. The court therefore properly found that, on the thirtieth day of March, 1901, she was and "for a long time prior thereto had been feeble in body and physically weak."

On said date she was subject to peculiar lapses of memory. In February preceding, at the funeral of her son, David, she talked in a loud, childish way, showing no appreciation of the occasion; she was forgetful and "all at sea" about property affairs during the early part of 1901; her mind was very changeable; she would be "of one mind one day and of an entirely different mind the next day"; she would order things and forget immediately whether she had paid for them; she

could not remember things that happened two or three days before; if she was sick with a bilious spell she would think someone was poisoning her; a few days before the deed was signed, an attorney, Mr. Rhodes, accompanied by a notary, went to her room with the deed to obtain her signature and acknowledgment. The attorney said to her: "We have come out to—he [referring to the notary] has come out with me to take your acknowledgment to the deed from yourself to Ed." She replied: "What deed? I do not know what you are talking about. I do not want to make any such deed as this now." Mr. Rhodes then said: "This is the deed that you and Ed and I have been talking about here, and that you are to make to him conveying to him the land that came to you from the estate of your deceased son, David J. Piercy," and she replied: "Why, I do not propose to make any such deed. I do not want to do it. I am not going to do it. Why should I do it? I do not understand this; I won't do it." Other circumstances appear, but the foregoing are sufficient to justify the finding of the court that by reason of her old age and mental weakness she was incapable of transacting or understanding business transactions "in a thoroughly intelligent manner and was particularly incapable of properly understanding the nature, effects and consequences of any act regarding the transfer of real property without independent advice and careful explanation thereof."

As already seen, Edward M. Piercy was the son of Mary J. Piercy. Moreover, they lived in the house together; he hired her servants and for a long time he had been the manager of her property and for years her agent, holding her general power of attorney. The confidential relation, therefore, so conspicuous in legal literature, existed between them in its most exacting form. The foregoing facts would warrant the inference of undue influence, and they constitute sufficient· support for the judgment of the lower court. The burdens and obligations imposed by the "confidential relation" and the significance of the elements of want of consideration and of physical and mental weakness in cases like this are fully considered and the authorities reviewed in the decision of this court in *Nobles* v. *Hutton,* 7 Cal. App. 21, [93 Pac. 292]. Therein it is declared that "It is a well-settled rule of equity jurisprudence that all gifts, contracts or benefits, from a prin-

cipal to one occupying a fiduciary or confidential relation to him are constructively fraudulent and void,'' and furthermore, that ''persons standing in a confidential relation toward others cannot entitle themselves to hold benefits which those others may have conferred upon them, unless they can show to the satisfaction of the court that the person by whom the benefits have been conferred had independent advice in conferring them and the advice should be given in private by someone of her own selection and when the grantor is not surrounded with dominating influences favoring the transfer.'' (See, also, *Payne* v. *Payne,* 12 Cal. App. 251, [107 Pac. 148] ; *Moore* v. *Moore,* 56 Cal. 89; *Ross* v. *Conway,* 92 Cal. 635, [28 Pac. 785] ; *Allore* v. *Jewell,* 94 U. S. 506, [24 L. Ed. 260].)

But granting that, in the absence of independent advice, under the other conditions mentioned such conveyance might be upheld, it will not and cannot be disputed that the burden is cast upon the donee to show to the entire satisfaction of the court that the gift was made freely and voluntarily with full knowledge of the facts and with entire understanding of the effect of the transfer, and in the absence of such clear and convincing proof, the conveyance is presumed to have been obtained by undue influence and to be void.

As we view the case, it is impossible to hold that the lower court should have been convinced or that it should have determined that said presumption was overcome and the asserted conveyance should be held valid. Indeed, aside from the weight to be attributed to the foregoing considerations, we find in the record evidence of other circumstances affording additional support for the judgment of the lower court. Among these is the important fact, embodied in the findings, that ''neither at the time of nor prior to the date of signing said deed did the said Mary Piercy have any legal or other advice except from persons acting for and in the interest of said Edward M. Piercy in reference to the said transaction or with reference to the nature, effects and consequences to herself of her said act and deed.'' A distinguished lawyer, who had been for many years a friend of Mary J. Piercy, and in whom, no doubt, she had confidence, visited her and advised the execution of the deed, but the court was justified in concluding that the adviser was employed by appellant and was zealous to promote the cause of his client. The circum-

stance of said friendship and confidence would, of course, naturally and properly excite in the mind of the trial judge a greater distrust of the occurrence. Other facts are detailed by witnesses which strengthen the inference that appellant exercised a dominating influence over the mind of his mother and that he took advantage of the situation for his personal aggrandizement. As illustrative of these, we refer to the following incidents: At times he refused to allow the friends and neighbors to visit her; both before and after the signing of the deed he prevented her relatives from seeing her on different occasions. In this connection the wife of plaintiff testified that, shortly before the deed transaction, she visited Mary J. Piercy and appellant ordered her not to come there any more and not to hire any more help as he intended to take care of that himself, and that his manner was rough and brutal, and that he subsequently ordered her out as before, saying, "You get out—either go the back or front of the house, but you get away from here"; that he intimidated his mother into signing papers, one incident being given by the last-mentioned witness, as follows: "Ed Piercy came into the room where his mother was and said to her, 'Here, come sign this paper.' She said, 'What for?' He says, 'Never mind; sign it, I tell you,' and she seemed to object again and he demanded her again to sign it and she did sign it. His manner was rough and cross and she seemed to fear him." Miss Annie Higgins also testified that "Ed Piercy was very rough-spoken toward his mother. She would be frightened and would not say a word and she would do just what he told her to do." On one occasion she was taking milk to Mrs. Piercy, and Edward Piercy said to her: "I don't want you coming over here any more." She said, "All right; why?" And he answered: "Never mind; I tell you not to come over here any more." Furthermore: "Mary Piercy spoke to Ed Piercy in my presence regarding the locking up of the gate or fence. She asked him what he did that for, and he said: 'That is my business.'" The witness testified also that she was present at different times when E. M. Piercy presented papers for his mother to sign. "He said: 'I need some money, mother, sign this paper.' So she signed it for him. I saw him bring in papers two or three times. He would not read the papers nor explain them to his mother. He was very rough spoken and

coarse. He used vulgar language toward his mother, and she would be frightened and she would do anything he would tell her to do.''

Again appellant did not record the deed for over six months after it was signed, and then he attempted to conceal the recordation from the newspapers. When Mrs. Piercy, however, learned that it was recorded, she employed an attorney, J. C. Black, to bring this action. Mr. Black testified that after bringing the action he received a message from Mrs. Piercy's house, and when he went there he found her in bed and ''Ed Piercy came out of the adjoining room and handed his mother a folded paper in my presence and demanded that she give it to me, and she asked Ed what it was. 'No matter,' he says, 'hand it to Mr. Black,' and his manner was decidedly excited and angry and threatening. The paper was a demand that I dismiss the suit that had been commenced against Ed Piercy.'' Thereafter the deposition of Mrs. Piercy was taken. Respondent says: ''It is the most remarkable deposition ever submitted to a court.'' Our information is manifestly too limited to verify this, but the appearance of the document is certainly peculiar and calculated to excite a degree of suspicion as to its integrity. The unusual feature about it is that there are so many interlineations that contradict the original transcription. Of this, two examples will suffice. She was asked this question: ''Then it is alleged here in the complaint filed by Mr. Black that on the thirtieth day of March last you made a deed of your interest as heir of David J. Piercy to the property; I want you to tell why you made that deed, if you made it, did you make it?'' The answer as transcribed was: ''I don't remember any deed making it.'' When corrected this was stricken out and the word ''yes'' substituted. Again she was asked: ''Well, then, I understand you to say you don't know whether or not the deed conveyed to Eddie the property that he conveyed to you?'' The answer as taken down was: ''No, I don't know nothing about it. I know whether or not—I don't know what you are—the meaning of what you are driving at.'' As corrected, the answer is ''Yes.'' It appears also that she several times appealed to her son, Edward, for answers to the questions, and it is quite manifest that she was not free from the dominating influence of his stronger personality. After se-

curing the discharge of Mr. Black, appellant procured friends of his own to represent his mother in the litigation, and the cause was tried with a result favorable to defendant. Honorable A. L. Rhodes, the trial judge, however, granted a motion for a new trial upon the ground of "irregularity in the proceedings of the defendant by which the plaintiff was prevented from having a fair trial of the action." The "irregularity" was shown by an affidavit of R. M. F. Soto to the effect that "through the wrongful procurement of defendant the action was, so far as the plaintiff's side thereof was concerned, practically tried as a mere formal matter, without any full and complete presentation of her case, and with the understanding on the part of those representing her at the trial, both that the transaction between the parties was entirely regular and valid, and that the real object of the trial was to dispose of any question as to the validity of the deed and confirm the title of defendant to the land described therein, such representatives being without knowledge as to material evidence which could have been produced in support of the cause of action stated in the complaint." (*Piercy* v. *Piercy*, 149 Cal. 165, [76 Pac. 508].) The cumulative effect of the foregoing circumstances upon the mind of the trial judge in the determination of the question of undue influence can be easily appreciated.

The finding as to nondelivery, we think, can be said also to have substantial support. The question whether the deed was delivered is a question of fact and must be determined by the circumstances surrounding each particular transaction. (*Kenniff* v. *Caulfield*, 140 Cal. 40, [73 Pac. 803]; *Moore* v. *Trott*, 162 Cal. 268, [122 Pac. 462].) The actual fact to be ascertained is the intention of the grantor as to passing title. (*Brown* v. *Westerfield*, 47 Neb. 399, [53 Am. St. Rep. 532, 66 N. W. 439]; *Huse* v. *Denn*, 85 Cal. 399, [20 Am. St. Rep. 232, 24 Pac. 790].)

The recording of a deed is not a delivery by the grantor to the grantee unless the deed comes from the hand of the grantor or someone claiming through or under him. (*Barr* v. *Schroeder*, 32 Cal. 609.)

"A delivery may be effected by a grantor doing something and saying nothing, or doing nothing and saying something or by both doing and saying something." (*Flint* v. *Phipps*,

16 Or. 437, [19 Pac. 543].) The court below might rationally conclude that the grantor neither did nor said anything to indicate an intention to deliver the deed or to pass the title and that by reason of her weakened physical and mental condition, she had no definite purpose in relation to the matter. That she did not actively and consciously participate in the transfer is not an unreasonable inference from the testimony of Mr. Rhodes, who said that he presented the deed to her and she signed it; that "the deed was not read to her but its contents were explained. She was helped to sit up in bed because of her physically weak condition. After Mrs. Piercy had signed the deed the notary took the car from her house, went down to his office, put his acknowledgment and seal on the deed and I took it to my office. While it was being signed, of course, it was in Mrs. Piercy's hands; after it was signed it went into the notary's hands; and from the notary's hands it went into my hands, and from my hands it went to Ed Piercy. During all the time it was at the Piercy house I saw it. Mrs. Piercy said nothing about the deed at the time she affixed her signature. She said nothing to me or Mr. Brundage or any other person after she had signed the deed. At the time of and after signing the deed Mrs. Piercy did not say anything to me or in my presence concerning the delivery of the deed." After a considerable period of time appellant asked Mr. Rhodes for the deed and it was given to him. From this testimony it is not unreasonable to conclude that in the transaction Mrs. Piercy was a mere passive instrument acting rather as an automaton manipulated by the agency of others than a willing and conscious actor in the formal transfer with a clear understanding and purpose that the title to the property should be vested in the grantee.

As to the rulings upon the admissibility of evidence, we may say we find no prejudicial error committed by the court during the progress of the trial.

Objection was made to the testimony of Mr. Rhodes as to a conversation participated in by him, Mrs. Piercy and appellant, on the ground that it was a privileged communication by reason of his relation as attorney for Mrs. Piercy. There is a controversy as to whether said testimony was not stricken out, but at any rate we cannot say that the ruling was erroneous, if for no other reason, because it does not appear that he

was her attorney. It is not made clear for whom he was acting. Of course, if he was the attorney for neither party, the communication was not privileged. But, assuming that he was the attorney of Mrs. Piercy, the conversation was not privileged because Edward M. Piercy was present and heard what was said. If he was the attorney for both parties, in any controversy between them the same condition would prevail. "When two parties address a lawyer as their common agent, their communication to the lawyer as far as concerns strangers will be privileged. But as to themselves, they stand on the same footing as to the lawyer, and either can compel him to testify against the other as to their negotiations. (1 Wharton on Evidence, sec. 587; *Hanlon* v. *Doherty*, 109 Ind. 37, [9 N. E. 782]; Greenleaf on Evidence, sec. 244; *Michael* v. *Foil*, 100 N. C. 178, [6 Am. St. Rep. 577, 6 N. E. 264].) In the latter case it was held that an attorney who wrote a deed could be examined as to what was said by the parties at the time relative to the transaction, whether he was acting as attorney for the one who called him or for both." (*In re Bauer*, 79 Cal. 312, [21 Pac. 759]. See, also, *Murphy* v. *Waterhouse*, 113 Cal. 467, [54 Am. St. Rep. 365, 45 Pac. 866]; *Harris* v. *Harris*, 136 Cal. 379, [69 Pac. 23].)

That the conduct of appellant in attempting to keep secret the recording of the deed was a proper subject for inquiry seems entirely clear. It was some evidence—open, however, to explanation—of the consciousness of fraud in connection with his acquirement of the deed. Secret, equivocal or evasive conduct, either precedent or subsequent, is often of persuasive force in the determination of the good faith of a transaction. So, subsequent concealment or secrecy as to the deed would be indicative of knowledge of the dishonesty of the original transaction and might indicate a purpose to avert any suit to set aside the conveyance until after the death of the grantor. The principle is as true now as it ever was that "Men love darkness rather than light because their deeds are evil."

The court admitted evidence of the declarations of Mary Piercy made subsequent to the date of the deed. These declarations were received for the purpose of showing the "relation of the parties." It is contended that the relation of the parties existing after the deed transaction was consummated

is entirely immaterial. But it is a familiar rule of evidence that when a person's mental condition at a certain time is in issue, a showing may be made of his condition both before and after, as indicative of his probable condition at the particular date in question. Some of the evidence along this line was offered in rebuttal of an affidavit introduced by appellant. This affidavit purported to have been made by Mrs. Piercy, and was to the effect that she was an unwilling plaintiff in this action, that she had not employed Mr. Black as her attorney, that she did not know that she was bringing the action and did not fully understand the nature of the proceedings. In contradiction to these assertions it was certainly proper for respondent to show that Mrs. Piercy did understand the situation and that her purpose was as indicated by the complaint, which was filed. This could be shown only by evidence of her acts and declarations at the time—she being dead—and we can see no legal objection to the evidence. It is clearly within the rule declared by section 1850 of the Code of Civil Procedure that ''Where, also, the declaration, act or omission forms part of a transaction which is itself the fact in dispute, or evidence of that fact, such declaration, act, or omission is evidence, as part of the transaction.'' Words so connected with and illustrative of an act as to elucidate and define its character are considered as appertaining to the act or situation and, like expression on the human face indicating the character of the man, are received in evidence to clarify a situation that might otherwise remain obscure. (*Cooper* v. *State,* 63 Ala. 80.)

As to the other evidence of Mrs. Piercy's statements, it may be said generally that it is brought within the principle of the decisions holding in effect that ''declarations by the maker made subsequent to the execution of wills or deeds are admissible as showing his state of mind. Such declarations need not be part of the *res gestae,* but are admissible because from a fair inference from all the circumstances such declarations show the party's mind at the time of the execution, his susceptibility to influence and his relations with those around him and the persons who are beneficiaries of his bounty. It is only necessary that the matters testified to should be sufficiently near in point of time that the testimony may be of value in determining the question directly in issue. The ques-

tion of remoteness is one for the court to determine, and the weight of the testimony is to be governed according to the facts." (*Chambers* v. *Chambers*, 61 App. Div. 299, [70 N. Y. Supp. 483]; *In re Denison's Appeal*, 29 Conn. 399; *Shailer* v. *Bumstead*, 99 Mass. 112; *Miller* v. *Livingstone*, 31 Utah, 415, [88 Pac. 338]; *Lane* v. *Moore*, 151 Mass. 87, [21 Am. St. Rep. 430, 23 N. E. 828].) The rule is recognized by our code, section 1870, Code of Civil Procedure, subdivision 4. There is some conflict in the authorities whether such evidence is admissible upon the issue of undue influence, but as to this, Wigmore, in volume 3, on Evidence, section 1738, declares that it "requires a consideration of many circumstances, including his state of affection or dislike for particular persons, benefited or not benefited by the will; of his inclination to obey or to resist these persons; and in general of his mental and emotional condition with reference to its being affected by any of the persons concerned. All utterances and conduct, therefore, affording any indication of this sort of mental condition, are admissible, in order that from these the condition at various times (not too remote) may be used as the basis for inferring his condition at the time in issue. This use of such data is universally conceded to be proper." The question necessarily involves two elements, as pointed out by Dixon, J., in *Rusling* v. *Rusling*, 36 N. J. Eq. 603; first, the conduct of him who is charged with exercising the undue influence, and second, the mental state of the other produced by said influence, which may require a disclosure of his strength of mind and of his purpose as to the disposition of the property both immediately before the conduct complained of and while subject to its influence. In order to show his "mental state at any given time his declarations at that time are competent because the conditions of the mind are revealed to us only by its external manifestations, of which speech is one. Likewise the state of mind at one time is competent evidence of its state at other times, not too remote, because mental conditions have some degree of permanency."

Here the competency of the grantor to understand any business transaction was directly in issue, and it was the contention of respondent that the dominating and coercive influence of appellant extended over the entire period of inquiry. It would seem, therefore, that the ruling of the court admitting the declarations is unquestionably correct.

The principle is not that involved in the case of *Bury* v. *Young*, 98 Cal. 446, [35 Am. St. Rep. 186, 33 Pac. 338], and *Ord* v. *Ord*, 99 Cal. 523, [34 Pac. 83]. In the former it was said that the declarations and acts of the grantor "made and done in his own interest months after the deed was delivered are not admissible as indicating his intentions in delivering the deed," and in the latter, that a "grantor will not be permitted to disparage his deed by declarations made or acts done by him in his own interest subsequent to its execution." But in those and other similar cases there was no issue as to fraud or the mental condition of the grantor, and the testimony was offered as evidence of the truth of the facts asserted in it and was clearly self-serving and hearsay. In a case like this it is plain the witness is permitted to detail declarations which he has heard, not as evidence of the truth of the fact asserted but of a spontaneous and unreflecting expression of the mental and emotional condition of the declarant. The distinction is marked and vital and recognized by the authorities.

An examination of the record convinces us that from a legal and equitable standpoint it would be wrong to reverse the judgment. It is, therefore, affirmed.

Hart, J., and Chipman, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 22, 1912.