[Civ. No. 2274. Fourth Appellate District.—June 28, 1939.]

In the Matter of the Estate of WALTER D. McCONKEY, Deceased. DOROTHY McCONKEY LONDON, Executrix, etc., Respondent, v. NORMAN McCONKEY, Executor, etc., Appellant.

Hales and Hales for Appellant.

Jerome Lyman Richardson for Respondent.

MARKS, J.—This is an appeal from a judgment decreeing that six lots on Orange Street in the city of Redlands were the property of Walter D. McConkey (also known as W. D. McConkey, W. McConkey and Walter J. McConkey) at the time of his death and are part of his estate; that deeds

purporting to convey those lots to Norman McConkey (Walter Norman McConkey) were void; requiring Norman McConkey to account to the estate for the rents, issues and profits of the property.

Walter D. McConkey died testate on January 19, 1936, at the age of almost eighty-two years. He left surviving him, as heirs at law and devisees, Norman McConkey, his son, and Dorothy McConkey London, his daughter, who were appointed executor and executrix of his last will and testament. He left his property in equal shares to Norman and Dorothy.

Norman assumed active charge of the administration of the estate. He returned an inventory and appraisement which did not include the Orange Street property. Dorothy filed a petition in which she alleged Norman was wrongfully claiming title to that property under two deeds from their father which were void because of lack of delivery to him and because of the mental incompetency and unsoundness of mind of their father at the time of the purported delivery; that the property belonged, subject to administration, to Norman and herself in equal shares; that Norman had wrongfully appropriated the rents, issues and profits of the property to himself under claim that they belonged to him and had refused to account for any of them. An order to show cause was issued and served. In so far as the record shows no answer was filed to this petition.

The trial court found to be true all facts alleged in the petition and rendered judgment accordingly.

As grounds for reversal of the judgment Norman urges that several of the findings of fact are not supported by the evidence and are contrary to all of the evidence. These questioned findings may be summarized as follows: (1) That Walter D. McConkey never delivered the two deeds, or either of them, to a third person in escrow to be delivered to Norman. (2) That Walter D. McConkey never delivered either of the two deeds to Norman and never intended to divest himself of title nor to invest Norman with title to any of the property described in the deeds. (3) That Norman, surreptitiously and without the knowledge or consent of his father, obtained possession of the two deeds and recorded them. (4) That Walter D. McConkey, from December 26, 1933, until his death, was mentally incompetent and of unsound mind.

As the sufficiency of the evidence to support these findings is challenged, we will summarize such of the evidence as supports them and will disregard other evidence conflicting with it.

Walter D. McConkey retired from the grocery business in about 1921. Norman bought the business shortly thereafter. In 1922 Walter D. McConkey considered making arrangements for the final disposition of his property and consulted his attorney. He requested information as to how he could make disposition of his property without incurring probate costs. He was advised that he could have the property deeded in joint tenancy with right of survivorship to himself and the person to whom he desired it to go; that he could convey the property to such person, reserving a life estate in himself; that he could sign and acknowledge deeds and place them in escrow with a third person to be delivered at his death.

On March 6, 1922, Walter D. McConkey signed and acknowledged a grant deed conveying four of the six lots on Orange Street to Walter N. McConkey. On October 10, 1922, he signed and acknowledged a grant deed conveying the other two lots on Orange Street to Walter Norman McConkey. The records of the notary public who acknowledged these two deeds, show that on October 10, 1922, Walter D. McConkey acknowledged a third deed conveying property to Dorothy London. The notarial record fails to contain any description of the property described in this deed. The deed itself disappeared.

A few years after the preparation of these deeds, probably around the year 1928, Walter D. McConkey delivered a sealed envelope to T. J. Hammett, a friend, who returned this envelope unopened to Walter D. McConkey in the latter part of 1934. If any instructions were given Mr. Hammett he did not remember them. The evidence did not disclose the contents of this envelope.

The health of Walter D. McConkey began to fail in 1929. Shortly thereafter he turned over all his business affairs to Norman. He spent some time in the Loma Linda Sanitarium in 1930. He was again admitted to that institution on September 7, 1932. The records of the hospital show that he was then suffering from senile dementia. On December 26, 1933, he suffered a cerebral hemorrhage which affected his mind and body and from which he never recovered.

He was confined to his bed until about June, 1934. For several months after that date he made a slow physical, if not mental, recovery until about August 1, 1935, when he was moved to a rest home in Loma Linda. From that date until his death he was confined to his bed and only sat up in it twice.

His condition from December 26, 1933, to about June, 1934, is described in considerable detail by several witnesses. His right side was completely paralyzed. He was physically helpless. He had no control over the functions of his body. The paralysis affected the muscles controlling his speech so that he could only mumble words. Only those who were frequently with him could interpret what he tried to say, partly from the sounds he uttered and partly through reading his lips. He thought that his wife, who had been dead eighteen years, was alive and he wanted to see her. He thought he was still in the grocery business (from which he had retired in 1921) and that he had been in his store. A permanent characteristic of these delusions was that he had seen his wife about two weeks before, and that he had been to the grocery store about two weeks before each time he expressed either of these ideas. He had other delusions. When attempting to express himself he was unable to keep to any subject. His mind would wander.

Between June 1, 1934, and August 1, 1935, his physical condition improved to such a degree that his nurse could get him out of bed and into a chair. This improvement continued until he could take a few steps with his attendant always present to keep him from falling. His ability to enunciate also improved but his mind remained "cloudy" or "foggy", as one witness described it. It would stay on one subject but a very short time. He insisted on subscribing for a daily newspaper but often had it upside down when attempting to read it. His delusions continued.

The nurse who attended him from December 26, 1933, to August 1, 1935, thought him mentally unsound and mentally incompetent to transact any business. The physician who attended him over the same period pronounced him of unsound mind. The superintendent of the rest home who cared for him from August 1, 1935, to January 19, 1936, expressed the following opinion: "Well, I took Mr. McConkey as a— just practically a physical and mental wreck. I mean by

that that he was a bed patient, and he had lost all his power of control, both physically and mentally.''

The sole evidence of the manual delivery of the two deeds by Walter D. McConkey to his son Norman is found in the testimony of the latter. Norman was called by Dorothy as the first witness for cross-examination under the provisions of section 2055 of the Code of Civil Procedure. He testified that his father was living in a house in an orange grove belonging to Norman; that he called on his father in March or April, 1934, and found him sitting in a rocking chair in the living room; that he had a conversation with him; that as he was leaving his father handed him a bundle of newspaper clippings, principally grocery advertisements, which were tied together with a string. He described this happening as follows: '' . . . When I got ready to leave he had these papers and the deeds and the circulars wrapped there and he says, 'Take these along.' So I noticed these deeds on there, and I asked him, 'What are these,' and he says, 'You takes those; those belong to you,' and if I remember right, that was all that was said about them, and I took all of them along, and I took them down to the store and put them in the safe there and I left them there—it must have been a year—ten months anyway, so one day my wife was cleaning out the old insurance policies, and she came across these deeds and asked me if they were any good, and I told her, 'Leave them out there, and I will take them down to Mr. Hales, and see what he says about them,' so I took them down there—that must have been a year later.''

Norman also testified that his father was only bedridden about two weeks following December 26, 1933; that on some days he was quite bright and rational and could walk by himself.

Following this appearance of Norman on the witness stand, various witnesses for Dorothy testified to the physical and mental condition of Walter D. McConkey which we have already described. It was established that he did not leave his bed until at least June 1, 1934. Mr. Hammett testified that he did not return the envelope which Walter D. McConkey had given him until after April, 1934. It should be remembered that Norman maintained in the trial court, and is maintaining here, that this envelope contained the two deeds which he testified his father delivered to him in March or April, 1934.

After these witnesses had testified, Norman again took the witness stand in his own behalf. He then contradicted his former evidence in several important particulars. He changed the date of the purported delivery of the deeds to an indefinite time after April, 1934, probably in July or August of that year. He also testified that when the deeds were delivered to him they were in a large envelope about twelve inches long. The trial judge may have concluded this was done in an effort to remove the conflict with the testimony of disinterested witnesses who had followed his first appearance on the stand.

Norman testified to many acts of dominion and control by his father over the Orange Street property. He also testified to his own conduct, which recognized his father's ownership of the property. He collected the rents and accounted to his father for them. He permitted his father to use the house in the orange grove as a residence in exchange for his occupancy of a store on one of the Orange Street lots. He estimated the rental value of each property at thirty dollars a month so that the one balanced the other and no money was exchanged between them. This arrangement lasted at least from December 26, 1933, to August 1, 1935. His father paid the taxes on the property up to 1933. Norman, out of his father's money which he controlled, paid the taxes for 1933, 1934 and the first installment for 1936. Who paid the taxes in 1935 does not appear, but Norman made no claim to having paid them out of his own funds.

In 1933 a fire insurance policy for three years was written on the buildings on the Orange Street property with the loss payable to W. McConkey. No change was made in the loss payable clause of this policy. In December, 1936, a lost policy certificate was issued to take the place of a lost fire insurance policy issued on the Orange Street property on September 28, 1936, for three years. The affidavit of the loss of the policy was made by Norman. In both the original policy, and the lost policy certificate, the loss, if any, was made payable to the estate of W. McConkey, deceased.

Appellant's argument that a delivery of the two deeds in question here was effected by their being placed in the hands of J. T. Hammett by Walter D. McConkey, needs scant consideration. It is essential to the validity of such delivery that the grantor place the instruments in the hands of a third party absolutely and without the power to control or

recall them. (*Moore* v. *Trott,* 156 Cal. 353 [104 Pac. 578, 134 Am. St. Rep. 131].) No such delivery to Hammett was established in this case. The return of the envelope by Hammett to Walter D. McConkey would negative the idea of any such delivery. In fact there is no evidence that these deeds were in the envelope which was delivered to Hammett. That leaves a further gap in the evidence which has not been bridged.

Appellant earnestly argues that the finding that the deeds were never delivered by Walter D. McConkey to Norman is not only unsupported by the evidence but is contrary to all of the evidence in the case. This argument is based on the testimony of Norman which, it is claimed, established the fact of a valid delivery that was not and could not be disputed as Norman was the only living witness to the purported delivery of the deeds. This argument is supported by the rule laid down in *Stewart* v. *Silva,* 192 Cal. 405 [221 Pac. 191], as follows:

"Even if we assume that the trial court believed and intended to find as a fact that the attorney, his clerk and stenographer, and the defendant deliberately testified falsely as to the delivery of the deed, we still have the presumption of delivery arising from the fact that the grantee in the deed actually had the possession of the deed and produced it in court. This alone constituted *prima facie* evidence of delivery. (*Ward* v. *Dougherty,* 75 Cal. 240, 242 [7 Am. St. Rep. 151, 17 Pac. 193].) It was there said: 'Possession of a deed of property, however, by the grantee therein named, and upon the same principle by one holding by conveyance of the same property under him is *prima facie* evidence of its delivery.

" 'The question of delivery being one of fact, and possession being only primary evidence of delivery, he who disputes such fact may rebut the presumption arising from possession by showing that there has in fact been no delivery; but it has been said that where a deed is found in possession of the grantee, nothing but the most satisfactory evidence of nondelivery should prevail against the presumption. (Devlin on Deeds, sec. 294.) ' "

While the general rule laid down in the last cited case cannot be questioned, we believe there is a special rule which is applicable to the facts of this case and which must be

controlling here. It is stated in *Campbell* v. *Genshlea,* 180 Cal. 213, at page 224 [180 Pac. 336], as follows:

"It is to be remembered that in a case involving a purported gift *inter vivos,* based upon an alleged consideration of love and affection, where the donee is a daughter having the control and direction of the aged doner, a strong presumption of confidential relation arises which would place upon the beneficiary in the transaction the burden of showing fairness in dealing and full understanding on the part of the person parting with the property. (*Nobles* v. *Hutton,* 7 Cal. App. 14 [93 Pac. 289].) In the absence of such showing, the conveyance is presumed to have been obtained by undue influence and to be void. (*Piercy* v. *Piercy,* 18 Cal. App. 751 [124 Pac. 561]; *Odell* v. *Moss,* 130 Cal. 352 [62 Pac. 555]; *Ross* v. *Conway,* 92 Cal. 632 [28 Pac. 785].)"

█ Further, it is thoroughly settled in California that the credibility of a witness and the weight to be given to his testimony are questions directed to the trial judge and that under proper circumstances he may reject all or any part of the testimony of any witness if he believes such testimony to be untrue. In the instant case Norman McConkey rather thoroughly impeached himself in his two appearances on the witness stand. Much of his evidence was flatly contradicted by disinterested witnesses. He had charge of all his father's affairs after 1932 and was his trusted agent. His father had executed a will in 1931 leaving his property to his two children in equal shares. In March, 1935, while his father was in a deplorable condition, physically and mentally, he caused to be recorded two deeds which conveyed to him the most valuable real estate owned by his father. He paid nothing for this property. He was not on good terms with his sister Dorothy. He claimed delivery of these deeds to him by his father under circumstances which could not have occurred, according to the evidence of entirely disinterested witnesses, while his father was of unsound mind and probably without sufficient mentality to comprehend the nature of his act. Also, there is strong circumstantial evidence contradicting the fact of delivery of the deeds and the passing of title to the property from Walter D. McConkey to Norman.

Under these circumstances the trial court was fully justified in concluding that Norman failed to meet the burden of showing the fairness of his dealings and that his father fully

understood the effect of handing the deeds to Norman. Under such circumstances and in the absence of such showing on the part of Norman, the manual tradition of the deeds meant nothing and the transaction was void. No title passed to Norman.

Appellant's attack on the finding that he obtained the two deeds surreptitiously is probably well founded. However, this fact cannot affect our decision. If there was no valid delivery of the deeds, no title passed to Norman, regardless of how he gained possession of them.

Appellant urges that the finding that Walter D. McConkey, after December 26, 1933, "was mentally incompetent and of unsound mind" fails to support the judgment. We think this position sound. The mental incompetency and unsoundness of mind must go to the point at issue, namely, a mental incompetency to understand the nature and effect of the act in question, the delivery of the deeds, and to form an intention to pass title to the grantee by the act of handing the instruments to him. A person who is mentally incompetent and is of unsound mind, but who is not insane, may, under proper circumstances, make a will or transfer his property. (*Estate of Perkins*, 195 Cal. 699, 703 [235 Pac. 45]; *Hellman Commercial Trust & Sav. Bank* v. *Alden*, 206 Cal. 592 [275 Pac. 794]; *Hemenway* v. *Abbott*, 8 Cal. App. 450 [97 Pac. 190]; *San Francisco Credit Clearing-House* v. *MacDonald*, 18 Cal. App. 212 [122 Pac. 964].)

The fact that the finding of the mental incompetency and unsoundness of mind of Walter D. McConkey is incomplete cannot affect our decision here. As the finding that there was no valid delivery of the deeds to Norman is supported by the evidence and supports the judgment, the finding we are considering becomes immaterial. No title to real property can pass by a deed that has not been delivered.

Judgment affirmed.

Barnard, P. J., concurred.