[Civ. No. 23387. First Dist., Div. Two. May 17, 1967.]

RICHARD LAWSON, as Executor, etc., et al., Plaintiffs, Cross-defendants and Respondents, v. SANFORD P. LOWENGART, JR., Defendant, Cross-complainant, and Appellant; GEORGE CUMMINGS, Defendant, Cross-complainant and Respondent; BETTY BERTRAND et al., Interveners, Cross-defendants and Respondents; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Intervener, Cross-complainant and Appellant.

Thomas J. Cunningham and John P. Sparrow for Intervener, Cross-complainant and Appellant.

Kelso, Cotton & Ernst and Thomas F. Casey, Jr., for Defendant, Cross-complainant and Appellant.

George W. Wilson and Keith E. Abbott for Plaintiffs, Cross-defendants and Respondents.

Crist, Peters, Donegan & Brenner, Ropers, Majeski & Phelps, Colin Peters and Eugene J. Majeski for Interveners, Cross-defendants and Respondents.

No appearance for Defendant, Cross-complainant and Respondent.

TAYLOR, J.—Defendants appeal from a judgment quieting title in plaintiffs,[1] Richard Lawson and Wells Fargo Bank American Trust Company (hereafter bank), as executors of the estate of Dr. Alice F. Maxwell (hereafter Dr. Maxwell), to certain securities held in a custody account by the bank. Defendants,[2] who claim ownership of these securities under a purported *inter vivos* trust agreement signed by Dr. Maxwell four days before her death, contend that the evidence does not support the findings and judgment.

Viewing the record most favorably to the judgment, the following facts appear. Dr. Maxwell had a heart attack on March 14, 1961, and died on March 20, 1961, at the age of 70. Her will, dated October 23, 1956, was admitted to probate on April 28, 1961, and plaintiff Lawson and the bank appointed as executors.

At the time of Dr. Maxwell's death, the bank, pursuant to a written agreement, had in its possession in a custody account in Dr. Maxwell's name certain stocks, bonds and cash (hereafter referred to as the agency account and agency account securities). All of the stock certificates stood in Dr. Maxwell's name; all the bonds were bearer bonds except for an issue of $10,000 par value U.S. Treasury notes that were registered in her name. Dr. Maxwell had also signed and deposited with the bank a number of blank stock powers to enable the bank to follow the directions furnished by Loomis-Sayles with respect to transactions involving the agency account securities.

Besides the agency account securities, which represented the bulk of her estate, Dr. Maxwell at the time of her death owned the residential property in Los Altos which she and her long-time secretary and companion, Helen Brown, had occupied since 1953, and a group of securities held by the brokerage firm of Richard Lawson (hereafter the Lawson securities).[3]

---

[1]The action was filed by Richard Lawson and the bank; two second cousins of the deceased, Betty Bertrand and Jane Cummings, individually and as guardians ad litem for their respective minor children, and Joan Alice Pickslay, the adult daughter of Jane Cummings, all of whom are beneficiaries under both the will and the *inter vivos* trust, intervened as plaintiffs.

[2]Defendants and cross-complainants are Sanford P. Lowengart, Jr. and George Cummings, the named trustees of the *inter vivos* trust, and a beneficiary thereof, The Regents of the University of California, who intervened as a defendant. Cummings did not appeal.

[3]The agency account securities totaled in excess of $750,000 at her death; the Lawson securities about $64,000; the real property had an estimated tax value of about $60,000.

The will, except for one specific bequest of $5,000, left Dr. Maxwell's entire estate in trust with the bank, Richard Lawson and George Cummings as trustees. The estate, exclusive of the Los Altos home and its furnishings, was divided into four equal and separate trusts for the benefit, respectively, of Marion Maxwell (Dr. Maxwell's first cousin who was 71 years old in 1961), Jane Cummings and her children, Betty Bertrand and her children, and Helen Brown.

The income of each of the four separate trusts was to be payable to the primary beneficiary during her life. On the deaths of Marion Maxwell and Helen Brown, the remainders of their respective trusts were to be added in equal shares to such of the other three separate trusts as were then in existence. On the deaths of Jane Cummings and Betty Bertrand, the remainders of their respective trusts were, as circumstances required, to be distributed to or continued to be held for their respective children. The trust share of any child of Betty Bertrand or Jane Cummings dying before it was entitled to receive distribution from the respective trust was to be added to the trusts held for his or her surviving brothers and sisters.

The Los Altos home and its furnishings were specifically allocated to the Helen Brown trust, which further provided that as long as Helen Brown desired to do so, she was to live in the home without charge. During her residency, the trustees were prohibited from selling, leasing or encumbering the home and were required, at the expense of the other principal assets of the Helen Brown trust, to pay all taxes on the property and maintain it in good repair and habitable condition.

The provisions of the will reflected Dr. Maxwell's intent to provide for Helen Brown and all of the doctor's relatives, and particularly Jane Cummings and Betty Bertrand and their respective children, who were more like nieces than cousins to Dr. Maxwell. Dr. Maxwell wanted to be absolutely sure that her long-time secretary and companion, Helen Brown, would never want either for a place to live or for the wherewithal to be cared for during the balance of her life.

Prior to drafting the will, Dr. Maxwell discussed *inter vivos* trusts and the possibility of changing attorneys with defendant Lowengart, but she decided to retain her then attorney, George Wilson. George Wilson indicated that an *inter vivos* trust agreement would not meet her requirements and drafted the will with its testamentary trusts. In May

1957 Dr. Maxwell informed defendant Lowengart that she had executed a new will and that both her attorney and Mr. Wakefield of the bank felt that a living trust was not advisable.

At the time the 1956 will was drafted, Dr. Maxwell was adamant in her desire not to leave anything to the University of California (hereafter University), although she had taught at its medical school from 1920 until 1943. This was due to a disagreement she had with the University. The 1956 will reflected a change from her prior dispositions in this regard.

In the first part of 1960, defendant Lowengart again suggested and discussed the advisability of an *inter vivos* trust with Dr. Maxwell. In August, he spent several hours with her going over plans for trusts and agreed to be a trustee. After she indicated that she thought there was a degree of self-interest in attorneys and banks in opposing living trusts, and that she wished to change attorneys, he helped her select Mr. Cotton. He discussed the estate plan with Mr. Cotton in some detail the latter part of January 1961.

Dr. Maxwell, defendant Lowengart and Mr. Cotton met in the latter's office in February. At this meeting, defendant Lowengart suggested the University as a beneficiary of the *inter vivos* trust. Despite her earlier disagreement with the University, Dr. Maxwell acceded to this suggestion as she was interested in making a charitable donation of $100,000 for tax purposes. At first, she considered the exclusion of the Lawson securities from the proposed *inter vivos* trust. However, she eventually decided to include them, as well as the Los Altos home, in the trust corpus. She wanted the living trust to include everything except her personal effects and some cash.

On March 13, 1961, Dr. Maxwell, Mr. Cotton and defendant Lowengart again met to discuss the proposed *inter vivos* trust agreement which was part of a new estate plan. Dr. Maxwell was to send the Lawson securities and deed to the Los Altos property to Mr. Cotton. Defendant Lowengart's memo of that meeting indicated that a new will naming him as executor was to be drafted by Mr. Cotton. On returning home from the March 13 meeting with Mr. Cotton, Dr. Maxwell said to Helen Brown: "Well, Helen, the house is yours." Helen understood this to mean that after Dr. Maxwell's death, she could live in the Los Altos home and enjoy it as long as she wished to do so.

On March 14, 1961, Dr. Maxwell suffered the heart attack

and was taken to the Palo Alto-Stanford Hospital. On learning of this fact the following day, defendant Lowengart asked Miss Brown to ask Dr. Sayer, the attending physician, whether Dr. Maxwell could sign the trust agreement. Dr. Sayer told Helen Brown it would be all right for Dr. Maxwell to sign an instrument but she should not read it nor should it be read to her and there should be no discussion of it. Miss Brown so informed both Mr. Lowengart and Mr. Cotton, who then drafted the proposed trust agreement and planned to take it to Dr. Maxwell on the 16th.

At no time after Dr. Maxwell left Mr. Cotton's office on March 13 or after she entered the hospital did she express any concern over the fact that she had not executed the trust agreement or ask Helen Brown to request Mr. Cotton or Mr. Lowengart to expedite its execution. Dr. Maxwell did not evidence any concern about the state of her affairs. When, on the morning of March 16, prior to Mr. Cotton's arrival, Helen Brown told Dr. Maxwell that Mr. Cotton was coming down for a signature, Dr. Maxwell replied: "Oh, no, not today, Helen, I'm so tired" but after she was told Mr. Cotton was on the way, she said: "Oh, all right."

Mr. Cotton testified that he arrived at the hospital with the trust document on the morning of March 16 and there, for the first time, met Helen Brown who went with him into Dr. Maxwell's room. Dr. Maxwell had not asked Mr. Cotton to come to the hospital but he brought the trust document because she had earlier indicated she wanted the trust put into effect and would like to have it signed and become effective when it was ready. He testified that on entering the hospital room, he told Dr. Maxwell he knew she wanted the agreement to become effective and was anxious for her to sign it and was concerned about it. However, Helen Brown, who was continually present while Mr Cotton was there and who stated she had testified to everything that either Dr. Maxwell or Mr. Cotton said, did not indicate that any such comments were made.

Mr. Cotton told Dr. Maxwell that the changes she wanted in the trust agreement had been made. The agreement was put before her on a hospital tray with only the signature page exposed and she signed that page and also initialed the list of securities attached as Exhibit "A" and entitled "Property Transferred By Alice F. Maxwell To The Trustees Of The Alice F. Maxwell Trust." Dr. Maxwell did not read or review the instrument or examine any page to see what stock

was included. She could not have previously seen or much less read the first four pages of the instrument or the attached list of securities since these had been prepared after she left Mr. Cotton's office on March 13.

As Dr. Maxwell was signing the trust agreement, she said: "Well, what about the deed to the house and the other stock?" referring to the Los Altos home and the Lawson securities. Mr. Cotton replied: "Oh, that's incidental. I'll take care of that." Dr. Maxwell did not give Mr. Cotton any instructions concerning the disposition of the instrument. Mr. Cotton spent a total of four or five minutes in Dr. Maxwell's room.

The *inter vivos* trust agreement (hereafter agreement) signed by Dr. Maxwell on March 16 did not purport to transfer to the trustees the Los Altos home or Lawson securities or any other portion of Dr. Maxwell's estate except the agency account securities. It authorized the trustees to receive other property to be held subject thereto, and expressly provided that Dr. Maxwell could at any time withdraw any property subject to the trust or revoke or terminate the agreement.

The agreement further provided that the entire income was to be payable to Dr. Maxwell during her life, and upon her death, the trust estate was to be divided into four equal and separate trusts, the Helen Elizabeth Brown, Marion Maxwell, Jane Cummings, and Betty Bertrand trust, respectively. Each person named was to receive the life income of the trust bearing her name.

As to the Helen Brown trust, the trustees were given sole and uncontrolled discretion to retain the Los Altos home and allocate it to the Helen Brown trust as part of the equal share of that trust. If the trustees so allocated the home, Helen Brown was to use it, rent free, as a residence during her lifetime or until such earlier time as the trustees, in their uncontrolled discretion, deemed that it be sold. The trustees were also given sole and absolute discretion to purchase from the assets of the Helen Brown trust a contract for care, room, board and services at a rest home or other institution where retired elderly people live.

The remainder interests of the Helen Elizabeth Brown and Marion Maxwell trusts were on their deaths to be distributed to the University for medical scholarships at the San Francisco campus. The remainder interest of the Jane Cummings trust on her death was to go to her issue as she appointed by will, or if she failed to so appoint, to her issue per stirpes. If

any of her issue died before reaching the age of 21, that share would go as he (or she) appointed by will, or in default of appointment, to his issue, or in the absence of issue, per stirpes to the other issue of Jane Cummings, and otherwise to the University for medical scholarships.

The remainder interest of the Betty Bertrand trust was to go to her issue, if she appointed by will, or failing such appointment, to her issue per stirpes. If any of her issue died before reaching the age of 21, that share was to go as he (or she) appointed by will, or failing such appointment, to his issue, or in the absence of issue, then per stirpes to Jane Cummings' issue,[4] if any, and otherwise to the University for medical scholarships.

After leaving the hospital on March 16, Mr. Cotton took the trust instrument to San Francisco where he secured the signatures of the named trustees (defendants Lowengart and Cummings) at their respective offices. Defendant Cummings read a portion of the trust agreement before signing and was told the substance of the agreement by Mr. Cotton, who indicated that he was in a hurry to secure defendant Lowengart's signature.

On March 16, 1961, Mr. Lowengart telephoned Mr. Utzinger (a bank trust officer) and told him that Dr. Maxwell had had a heart attack and had or would execute the agreement that Mr. Cotton had prepared and that a copy would be provided for the bank which would act as agent for the trustees under a new agency agreement. Mr. Utzinger indicated that after the original trust agreement was in the bank's hands, the matter would be referred to his superior to set up the new agency agreement and that the bank had on hand a sufficient number of blank stock powers signed by Dr. Maxwell to accomplish a transfer of stocks in the agency account to the trustees.

On March 17, the bank received in the mail a copy of the trust agreement with the names of Alice Maxwell, Sanford Lowengart and George Cummings typed on the signature lines. The same day, defendant Lowengart told defendant Cummings that the bank would not acknowledge his authority and that he was having difficulty executing the stock powers.

---

[4] Mr. Cotton testified that this designation of the issue of Jane Cummings as recipients of the portions of the Betty Bertrand trust was contrary to Dr. Maxwell's intent and it constituted an obvious error that he and his secretary had missed. When the trust agreement was prepared, Betty Bertrand had 7 children, the eldest 13, the youngest 4.

On March 19, defendant Cummings visited Dr. Maxwell in the hospital room. By this time, he had read the entire March 16 agreement. During the visit, Dr. Maxwell told him that she had made a new will, but did not indicate that she had executed an *inter vivos* trust agreement. She did not ask him to serve as trustee or do anything with regard to her estate or facilitate the transfer of any stock, nor mention the charitable donation to the University. She merely indicated to him she was leaving her property to Helen Brown, Marion Maxwell, Betty Bertrand, and his wife.

Dr. Maxwell died on March 20, 1961. As of the date of her death, none of the agency account securities were transferred from that account or even endorsed by her or delivered to the trustees named in the March 16 agreement, nor had the bank received any written instructions necessary for the use of the blank stock powers to transfer the agency account securities. The agency account securities remained in the agency account in the possession of the bank until the trial of the instant action.

The court found that Dr. Maxwell signed the trust instrument under mistake of fact and that she would not have signed it had she realized that it failed to express her intent as to material matters; that she did not intend that it become operative as a transfer of the agency account securities; that she did not intend that the instrument become effective as to the property therein described alone or that it become effective at all unless and until there had also been transferred to the trustees the Los Altos real property and the Lawson securities, neither of which was transferred by the instrument.

The court further found that there was not any authorized delivery of the instrument to any trustee or to the bank which had custody of the agency account securities; that Dr. Maxwell did not duly make, execute and deliver the instrument of March 16; that Dr. Maxwell never instructed or authorized the bank to deliver or transfer the agency account securities to the trustees; and that accordingly, there was not any actual, symbolic or constructive delivery of the instrument or any of the therein described property comprising the trust corpus.

Defendants contend on appeal that these findings are not supported by the evidence and that the trust agreement transferred the agency account securities to them. When a finding of fact is challenged, the province of the reviewing court be-

gins and ends with a determination as to whether the finding is supported by any substantial evidence, contradicted or uncontradicted. If there is such evidence, the finding cannot be disturbed (*E. K. Wood Lumber Co. v. Higgins*, 54 Cal.2d 91 [4 Cal.Rptr. 523, 351 P.2d 795]).

 Defendants first attack the trial court's finding that the trust instrument was signed under a mistake of fact. Our detailed review of the facts indicates that there is substantial evidence to support such a finding. There was evidence that prior to the March 13 meeting with Mr. Cotton, Dr. Maxwell indicated she did not understand what the first draft of the trust agreement was all about and saw no sense in reading it. The attending physician had given express orders that the agreement not be discussed with her. It is undisputed that Dr. Maxwell did not read the instrument but merely signed the signature page and initialed the attached Exhibit "A" without receiving any description thereof.

The instrument did not purport to transfer the Los Altos home or Lawson securities and when Dr. Maxwell, apparently aware of this fact, asked about them, Mr. Cotton indicated that these were incidental and would be taken care of later. In view of the fact that Mr. Cotton was then her attorney, Dr. Maxwell was entitled to rely on his promise to cause them to be included in the trust and to expect that they would be so included before the agreement became effective. Furthermore, the provisions of the trust agreement giving the trustees absolute discretion to sell the Los Altos home during the lifetime of Helen Brown and to make other arrangements, was contrary to Dr. Maxwell's repeatedly expressed intent that the house belong to Helen Brown for life.

The error in the instrument concerning the remainder of the Betty Bertrand trust (fn. 4, *supra*) is conceded by defendants. Even assuming, for the sake of argument, that this error was, as defendants contend, *de minimis*, it is nevertheless inimical to Dr. Maxwell's particular concern for and intention to provide for Betty Bertrand and her children,[5] and further supports the finding that Dr. Maxwell did not intend the instrument to become effective as written.

From the mere facts that on the Sunday following the signing of the trust agreement, Dr. Maxwell told defendant Cummings that she had made a new will and explained to him that

[5]Dr. Maxwell wanted to make certain that Betty's husband Julius would not be able to reach the money. By the time of trial, Betty and Julius were divorced.

she had left her property to Marion Maxwell, Betty Bertrand, Jane Cummings and Helen Brown, and that she made no mention of the execution of an *inter vivos* trust or ask him to serve as a trustee, the court could infer that she was mistaken as to the effect of her signature and the nature of the instrument signed. The statement indicates that Dr. Maxwell was unaware that defendant Cummings, a named trustee, had seen or signed or knew of the contents of the agreement. If the trial court believed Mr. Cummings' testimony that on signing the agreement Dr. Maxwell thought she had executed a new will, this was sufficient alone to support the finding of mistake and to affirm the judgment (cf. *Turino* v. *Capra*, 237 Cal.App. 2d 733 at p. 735 [47 Cal.Rptr. 271]). The trial court was entitled to disbelieve and reject any or all contradictory evidence (*Rolinson* v. *Rolinson*, 132 Cal.App.2d 387 at p. 390 [382 P.2d 98]; *Bechtold* v. *Bishop & Co., Inc.*, 16 Cal.2d 285 [105 P.2d 984]).

 Defendants contend that the trial court erred in its finding that there was not sufficient evidence to establish valid delivery of either the instrument or the trust corpus to the trustees. Delivery is largely a matter of the intent of the donor or trustor and is a question of fact to be determined from the surrounding circumstances (*Miller* v. *Jansen*, 21 Cal. 2d 473 [132 P.2d 801]). Under well established rules, the evidence is to be viewed in the light most favorable to plaintiffs and all reasonable inferences are to be drawn in favor of the determination of the trier of fact.

 Usually, the manifestation of the settlor's intent that the trust take effect immediately is evidenced by his delivery to the trustees of the subject matter of the trust or some act or an instrument indicating the settlor's relinquishment of dominion over the property. Where the means chosen is an instrument of transfer, the instrument must meet the requirements for a conveyance of the particular kind of property involved (Bogert, Trusts and Trustees (2d ed.) §§ 141, 142, pp. 4-9; § 147, p. 49; 1 Scott on Trusts (2d ed.) § 32.2, p. 251).

 Here, the agency account securities in the possession of the bank were never indorsed nor, in fact, delivered and the bank never received any properly authorized stock options or instruments from Dr. Maxwell to transfer the securities to the trustees prior to her death. Nor, as in *Thomas* v. *Lamb*, 11 Cal.App. 717 [106 P. 254], and *Logan* v. *Ryan*, 68 Cal.App. 448 [229 P. 993], was there any act by which Dr. Maxwell

surrendered to the trustees complete control and dominion over the property that was the subject of the gift in trust. ▋ Defendants, as the parties holding the affirmative and asserting the sufficiency of the gift in trust, had the burden of proving valid delivery to the trustees (Code Civ. Proc., § 1981; *Blonde* v. *Estate of Jenkins,* 131 Cal.App.2d 682, 686 [281 P.2d 14]).

Defendants refer to cases indicating that the delivery requirement is more strictly applied in relation to outright gifts than to trusts. They cite *Francoeur* v. *Beatty,* 170 Cal. 740 [151 P. 173], as authority for the sufficiency of the delivery in this case. However, in *Francoeur,* the validity of the unconditional instrument as a conveyance was not in question. The issue there was whether the retention of physical possession of the property after conveyance prevented title from vesting. The question in the instant case is whether, under the circumstances of its procurement, the agreement in question met the requirements of a valid *inter vivos* conveyance.

The actual or symbolic delivery of the securities was essential to complete the *inter vivos* trust. A delivery by instrument must have the intended effect of divesting the donor of all present control and vesting the trustees with an equitable present right to reduce the fund into possession (*Beebe* v. Coffin, 153 Cal. 174, 177-178 [94 P. 766]). A delivery may be symbolic, such as delivery of a written instrument, without physical delivery of the securities themselves, so long as the instrument is one upon which delivery of the trust corpus might be compelled (*Lefrooth* v. *Prentice,* 202 Cal. 215 [259 P. 947]; *Edwards* v. *Guaranty Trust etc. Bank,* 47 Cal.App. 86, 89 [190 P. 57]).

▋ The mere signing of the instrument by Dr. Maxwell did not constitute delivery nor create a presumption thereof (*Boyd* v. *Slayback,* 63 Cal. 493; *Miller* v. *Jansen, supra*). As to Dr. Maxwell's concern with the execution and completion of the *inter vivos* trust at the time of signing, the record is in sharp conflict, as indicated above. ▋ The court could reasonably infer that she had no intention that the trust become effective unless and until the Los Altos home and the Lawson securities were included. There is no testimony that she ever directed Mr. Cotton to deliver the instrument to any of the trustees nor that she gave him any irrevocable directions to so deliver it. As Mr. Cotton was then her attorney, the court could justifiably find, under the circumstances of this case, that his possession constituted her possession and that

she retained control. Possession by the grantor has been held to raise a presumption of nondelivery (*Tweedale* v. *Barnett,* 172 Cal. 271 [156 P. 483] ; *Lample* v. *McDougall,* 103 Cal.App. 779 [285 P. 328] ).

■ The fact that Dr. Maxwell handed the instrument to Mr. Cotton after signing it, did not of itself constitute a delivery to him or authorize him to deliver the instrument to the trustees. The mere handing of an instrument to a third party does not comprise delivery or authorize that person to deliver the same to the assignee unless there are express and definite instructions to that effect and unless such directions are irrevocable and the instrument is placed beyond the assignor's power of control or recall (*Jeannerette* v. *Taylor,* 2 Cal.App.2d 568 at p. 570 [38 P.2d 831] ; *Estate of McConkey,* 33 Cal.App.2d 554 at pp. 560-561 [92 P.2d 456] ; *Bank of America* v. *Frost,* 205 Cal.App.2d 614 [23 Cal.Rptr. 441] ; *Kunde* v. *Kunde,* 122 Cal.App.2d 624 [266 P.2d 608] ).

■ Here, while the instrument was in fact given to the trustees by Mr. Cotton, there was no expressed intention by Dr. Maxwell that the instrument was to be so delivered. It was the duty of the trial court to weigh the conflicting evidence concerning Mr. Cotton's authority and the inferences to be drawn from the facts of his employment (*Gagnon Co., Inc.* v. *Nevada Desert Inn, Inc.,* 45 Cal.2d 448, 459 [289 P.2d 466] ; *Sullivan* v. *Dunne,* 198 Cal. 183 [244 P. 343] ). As there was ample evidence that he was not authorized to deliver the agreement to the trustees, the fact that he did so and caused them to sign it is of no legal significance (*Rothney* v. *Rothney,* 41 Cal.App.2d 566, 570 [107 P.2d 294] ).

■ If. Dr. Maxwell had no intention of divesting herself of control at the time, the handing of the instrument to Mr. Cotton and his manumission of the instrument to the trustees would not constitute a constructive or symbolic delivery sufficient to establish the trust. The delivery or absence of delivery to the trustees by way of the trust agreement was a question of fact to be determined by the trial court (*Blackburn* v. *Drake,* 211 Cal.App.2d 806 [27 Cal.Rptr. 651] ). ■ We have concluded upon a consideration of the entire record that the court's finding that Dr. Maxwell never intended or effected delivery was sufficiently supported by the evidence (cf. *Pollard* v. *Pollard,* 166 Cal.App.2d 698 at pp. 702-703 [333 P.2d 356] ).

As our conclusion as to the sufficiency of the evidence to sustain the judgment on either of the first two issues raised

disposes of the appeal, we need not discuss the parties' contentions concerning the prerequisites for the transfer of the trust corpus.

The judgment is affirmed.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied June 12, 1967, and the opinion was modified to read as printed above.